IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

STATE OF ARIZONA,
*Appellee,*

*v.*

DARRELL BRYANT KETCHNER,
*Appellant.*

No. CR-13-0158-AP
Filed December 18, 2014

Appeal from the Superior Court in Mohave County
The Honorable Rick A. Williams, Judge
No. CR200900715

**AFFIRMED IN PART; REVERSED IN PART AND REMANDED**

COUNSEL:

Thomas C. Horne, Arizona Attorney General, Robert L. Ellman, Solicitor General, Jeffrey A. Zick (argued), Chief Counsel, Capital Litigation Section, Jeffrey L. Sparks, Assistant Attorney General, Capital Litigation Section, Phoenix, for State of Arizona

David Goldberg (argued), Attorney at Law, Fort Collins, CO, for Darrell Bryant Ketchner

JUSTICE TIMMER authored the opinion of the Court, in which CHIEF JUSTICE BALES, VICE CHIEF JUSTICE PELANDER and JUSTICES BERCH and BRUTINEL joined.

JUSTICE TIMMER, opinion of the Court:

**¶1** Darrell Bryant Ketchner was sentenced to death after a jury found him guilty of first-degree felony murder, attempted first-degree murder, first-degree burglary, and three counts of aggravated assault. We have jurisdiction over his automatic appeal under Article 6, Section 5(3) of

the Arizona Constitution and A.R.S. § 13-4031.[1]

## I. BACKGROUND[2]

**¶2**        In 1997, Ketchner began an on-and-off romantic relationship with Jennifer, the mother of two daughters, Ariel and Kenzie. In addition, Ketchner and Jennifer had three children together.

**¶3**        Beginning in 2008, Ketchner and Jennifer's relationship became increasingly volatile. The couple had several verbal and physical altercations, and Ketchner made death threats against Jennifer, Kenzie, and Kenzie's boyfriend, Nate. Jennifer obtained orders of protection in January 2008 and in January 2009 after violent encounters between Ketchner, Jennifer, and Kenzie that resulted in criminal charges against Ketchner. At Jennifer's request, the court vacated each order of protection, but Ketchner pleaded guilty to one misdemeanor assault charge, and other misdemeanor charges remained pending at the time of the crimes here.

**¶4**        On March 25, 2009, Ketchner told Jennifer that he would "slit her throat" if she sued for child support. He came to Jennifer's home the next day, but she refused to let him in. Ketchner then smashed the windshield and driver-side window of Nate's car, which was parked in the driveway. As a result, a criminal damage charge was filed against Ketchner. Jennifer obtained a third protective order, which was in place when the crimes in this case occurred. Nevertheless, Jennifer continued to see Ketchner occasionally and had dinner with him once at his home.

**¶5**        On May 15, Nate was driving when Ketchner blocked the way with his own vehicle. Ketchner jumped out, ran to Nate's car, and tried to open the locked driver-side door. Ketchner repeatedly yelled that he was going to "rip [Nate's] head off" if he did not drop the criminal damage charge against him. He also called Jennifer "a psychotic bitch" who "was going to get what's coming to her." Ketchner then punched the car door

---

[1]        We cite the current versions of statutes unless material changes have been made since Ketchner committed the offenses.

[2]        "We view the facts in the light most favorable to sustaining the jury's verdicts." *State v. Forde*, 233 Ariz. 543, 552 ¶ 2 n.2, 315 P.3d 1200, 1209 n.2 (2014) (citation omitted).

and left.

¶6          On July 2, Ketchner approached a marked patrol car occupied by Officer Kunert and said he wished to review a police report concerning criminal charges against him that he believed might be dropped soon. Officer Kunert told Ketchner how to obtain the report, and Ketchner left.

¶7          Two days later, Jennifer and her family celebrated a daughter's birthday without Ketchner, who had been told that he could not have the children that day.  Later that evening, Jennifer and Ariel sat at the kitchen table while Kenzie went into a bedroom with her younger siblings and Nate.  A few minutes later, as Nate was walking back toward the kitchen, Ketchner walked in through a side door.  Jennifer moved to the living room, screaming, "No, no, Darrell, no."  Ketchner then grabbed her by the hair and began striking her.  Nate retreated into a bedroom and then fled.  Meanwhile, Kenzie and her younger siblings escaped the home through a bedroom window.

¶8          Ketchner pursued Jennifer outside to the driveway, where she screamed, "He's trying to kill me, he's stabbing me," and "Darrell, get out of the house."  A neighbor saw Ketchner beating Jennifer, who was lying on the driveway, and yelled, "Darrell, get off of her."  Ketchner stepped back, looked at the neighbor, and then ran back into the house. Once inside, he went toward Jennifer's bedroom, where she kept a gun.  Ketchner came back outside, walked to where Jennifer was lying, and shot her in the head. Neighbors called 911, and Ketchner ran off.

¶9          Law enforcement and emergency personnel arrived in minutes.  They found Ariel lying in a pool of blood in Jennifer's bedroom. Ketchner had stabbed her eight times, and she later died.  Jennifer survived her injuries but had no memory of the attacks.

¶10          Police searched the surrounding area but could not find Ketchner that night.  The next morning, police found him lying on a golf course with Jennifer's loaded gun and a bag of items that included sex toys, pornographic movies, clothing, zip ties, and medicines.

¶11          A grand jury indicted Ketchner on seven counts:  first-degree murder, attempted first-degree murder, three counts of aggravated assault, first-degree burglary, and misconduct involving weapons.  Ketchner

pleaded guilty to the weapons charge and began serving a fifteen-year sentence.

¶12        A jury convicted Ketchner on the remaining six counts.  The jury found that Ketchner had committed felony murder but did not reach a consensus on premeditated murder.  After finding three aggravating circumstances and then considering evidence in the penalty phase, the jury determined that Ketchner should be sentenced to death.  The trial court subsequently sentenced Ketchner to death for Ariel's murder and imposed prison sentences totaling seventy-five years for the non-capital counts.

## II.    DISCUSSION

### A. Profile Evidence

#### 1. Admissibility

¶13        At trial, the State introduced expert testimony from Dr. Kathleen Ferraro, a sociologist who specializes in domestic violence issues, to educate the jury about domestic violence patterns and general characteristics exhibited by domestic violence victims and abusers. Ketchner argues, as he did before the trial court, that Dr. Ferraro impermissibly created a "profile" of domestic abusers. We review the trial court's ruling permitting this testimony for an abuse of discretion, *see State v. Boyston*, 231 Ariz. 539, 544 ¶ 14, 298 P.3d 887, 892 (2013), which can include an error of law, *State v. Wall*, 212 Ariz. 1, 3 ¶ 12, 126 P.3d 148, 150 (2006).

¶14        Dr. Ferraro testified about characteristics common to domestic violence victims and their abusers, many of which matched the evidence in this case.  Notably, Dr. Ferraro testified about "separation assault":

> Q.     What is separation assault?
>
> A.     When someone decides to leave a violent relationship is a very dangerous time, because then the abuser feels their control has—they've lost their control and they'll use violence.  It's a very high risk period for homicide when a person does leave the relationship.  And it's another aspect

of why people go back again, because they're not safe just because they leave the relationship.

Dr. Ferraro then described risk factors for "lethality" in an abusive relationship: presence of a gun in the house, stepchildren in the home, prior threats to kill, drug and alcohol use, forced sex, and strangulation.

¶15 Profile evidence tends to show that a defendant possesses one or more of an "'informal compilation of characteristics' or an 'abstract of characteristics' typically displayed by persons" engaged in a particular kind of activity. *See State v. Lee*, 191 Ariz. 542, 544–45 ¶ 10, 959 P.2d 799, 801–02 (1998) (quoting *Florida v.* Royer, 460 U.S. 491, 493 (1983); *Reid v. Georgia*, 448 U.S. 438, 440-41 (1980)) (describing drug-courier profiles). Although there may be legitimate uses for profile evidence, such as at suppression and probable cause hearings when the justification for making a stop or arrest is at issue, profile evidence may not be used as substantive proof of guilt because of the "risk that a defendant will be convicted not for what he did but for what others are doing." *Id.* at 545 ¶¶ 11–12, 959 P.2d at 802 (quoting *State v. Cifuentes,* 171 Ariz. 257, 257, 830 P.2d 469, 469 (App. 1991)).

¶16 The State disputes that Dr. Ferraro offered profile evidence, characterizing her testimony as describing patterns in abusive relationships rather than relating general characteristics of domestic abusers. According to the State, "this testimony was not used to show that Ketchner was guilty because he fit a domestic abuser profile, but rather to show that the relationship between [Jennifer] and Ketchner was in many ways typical of relationships involving abuse."

¶17 Although the admissibility of profile evidence in the context of domestic violence is an issue of first impression in Arizona, other courts have addressed the issue. In *Ryan v. State*, 988 P.2d 46 (Wyo. 1999), the jury in a first-degree murder trial heard extensive evidence that the defendant physically abused his wife in the months leading to her murder, that he demonstrated jealous and controlling behavior toward her, and that he and his wife had separated a few weeks before the murder. *Id.* at 51–52. An expert witness testified that "separation violence" occurs when an abuser commits extreme acts of violence in an effort to assert control over his or her partner after their relationship has ended. *Id.* at 53. The Wyoming Supreme Court concluded that, although admission of the evidence was

harmless in that case, this testimony was improper profile evidence that implicitly invited the jury to infer criminal conduct based on the described characteristics. *Id.* at 56–57. The court did not explicitly identify the grounds for its decision, but it relied on cases that articulated three bases for excluding profile evidence as substantive evidence of guilt: that the evidence lacked relevance, that its probative value was substantially outweighed by its prejudicial effect, and that it constituted impermissible character evidence. *Id.* at 55.

**¶18** Other courts have likewise found such profile evidence inadmissible. *See Brunson v. State*, 79 S.W.3d 304, 312–13 (Ark. 2002) (relying on *Ryan* to reverse a conviction after admission of testimony from a domestic violence expert regarding a profile of batterers who become murderers); *Parrish v. State*, 514 S.E.2d 458, 463 (Ga. Ct. App. 1999) (holding that expert's testimony about typical characteristics of a batterer improperly placed defendant's character in issue). Courts have also precluded profile evidence relating to "battering parents," *see Commonwealth v. Day*, 569 N.E.2d 397, 399–400 & n.2 (Mass. 1991); *Duley v. State*, 467 A.2d 776, 779–80 (Md. Ct. Spec. App. 1983), and persons who sexually abuse children, *see Hall v. State*, 692 S.W.2d 769, 773 (Ark. Ct. App. 1985); *State v. Maule*, 667 P.2d 96, 99 (Wash. Ct. App. 1983). *Ryan* and like cases are consistent with this Court's decision in *Lee* that profile evidence should not be introduced as substantive evidence of guilt.

**¶19** Dr. Ferraro's testimony about separation violence and lethality factors was inadmissible profile evidence. This evidence did not explain behavior by Jennifer that otherwise might be misunderstood by a jury; indeed, the nature of her abusive relationship with Ketchner was uncontested. *Cf. State v. Salazar-Mercado*, 234 Ariz. 590, 594 ¶ 15, 325 P.3d 996, 1000 (2014) (noting that expert testimony about general behavior patterns of child sexual-abuse victims is permitted when helpful for a jury to understand the evidence). Rather, Dr. Ferraro's testimony predicted an abuser's reaction to loss of control in a relationship. There was no reason to elicit this testimony except to invite the jury to find that Ketchner's character matched that of a domestic abuser who intended to kill or otherwise harm his partner in reaction to a loss of control over the relationship. The trial court thus erred by permitting Dr. Ferraro to opine about separation violence, lethality factors, and any characteristics common to domestic abusers.

## 2. Harmless Error Review

¶20        The admission of Dr. Ferraro's testimony requires reversal of Ketchner's convictions and sentences unless the error was harmless. *See State v. Henderson*, 210 Ariz. 561, 567 ¶ 18, 115 P.3d 601, 607 (2005). "Harmless error review places the burden on the [S]tate to prove beyond a reasonable doubt that the error did not contribute to or affect the verdict or sentence." *Id.* (citation omitted). Notably, the State failed to argue in its brief that the error was harmless.

¶21        The only charges in dispute at trial were first-degree murder and burglary. Ketchner did not contest that he assaulted Jennifer and assaulted and killed Ariel. But he claimed that the State had failed to prove that he premeditatedly murdered Ariel or committed burglary, the predicate charge for felony murder. Because the jury did not find Ketchner guilty of premeditated murder, we must decide whether the State has demonstrated beyond a reasonable doubt that the profile evidence did not contribute to or affect the felony-murder verdict.

¶22        As the State acknowledged at oral argument before this Court, the prosecutor did not argue that Ketchner remained unlawfully in Jennifer's home with the intent to commit a felony. Instead, the key factual dispute relating to the burglary charge was whether Ketchner entered Jennifer's home intending to commit a felony or instead to have consensual sex with Jennifer. The prosecutor argued that Ketchner entered to kill Jennifer "to take control of the family that he was losing." Defense counsel countered that Ketchner entered, possibly high on methamphetamine, expecting to have sex. Counsel further maintained that after Ketchner saw Nate, a quarrel erupted that sparked the violent events, and therefore Ketchner was guilty of only second-degree murder. Evidence supported both scenarios, and the trial court instructed the jury on first-degree murder and the lesser-included offense of second-degree murder. *State v. Vickers*, 159 Ariz. 532, 542, 768 P.2d 1177, 1187 (1989) ("The court must instruct the jury on every lesser-included offense to the one charged if the evidence supports the giving of the instruction.").

¶23        Dr. Ferraro's profile evidence provided an expert opinion about how abusers who have lost control of a victim react, inviting the jury to conclude that Ketchner went to Jennifer's home that evening intending to either kill or harm her to regain control of his family. The prosecutor

repeatedly referred to this "control" motive as a theme in his opening statement and closing argument:

> They were moving on. They were happy. He had lost control, and that night he decided to take control. That night he decided to fulfill his threats, and that night he was there to kill. . . .

> Darrell Bryant Ketchner came to [Jennifer's house] to kill, to take control of the family that he was losing. The family that had shut him out. . . .

> Darrell Ketchner had come there to kill, to take control of this family that he was losing. . . .

> The defendant was angry. . . . Because they are not letting him back in where he has always been allowed back. He is losing his control. . . .

> The defendant no longer had control of her, of his kids, of their life. . . .

> They were moving on. They were strong. And he had lost control. And that night he decided to take that control back. He decided to kill, and he did. . . .

> On that night, Darrell Ketchner entered into the house . . . knife in hand, dark clothes, immediately attacking, taking control of the family that was shutting him out, the family he was losing. . . .

> He was losing his family. He was losing control. He was losing it.

¶24 The prosecutor emphasized the profile evidence by pointing out Dr. Ferraro's testimony to the jury as aiding their understanding of domestic violence "commonalities" and "patterns," including separation violence. The prosecutor then related these patterns to the parties' relationship in this case and described the "lethality" factors present — gun in the home, stepchildren in the home, prior threats to kill, and drug use —

and impliedly asked the jurors to find that Ketchner acted in conformity with the abuser profile.

¶25        Because the profile evidence provided an expert opinion on a key issue before the jury — whether Ketchner entered Jennifer's house with the intent to commit a felony — the State has not proved beyond a reasonable doubt that the evidence did not contribute to or affect the jury's verdict on the felony murder and burglary counts. For this reason, we reverse the felony murder and burglary convictions and resulting sentences.

¶26        The error, however, is harmless as to the convictions and sentences for aggravated assault and attempted first-degree murder. Whether Ketchner entered Jennifer's house with the intent to commit a felony was not relevant to these offenses, and the evidence that he committed those offenses was uncontested.

## III.    CONCLUSION

¶27        We reverse Ketchner's convictions and sentences for first-degree murder and first-degree burglary and remand for a new trial. We affirm Ketchner's convictions and sentences on three counts of aggravated assault and one count of attempted first-degree murder.