IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA,
*Appellee,*

*v.*

MARK HASKIE, JR.,
*Appellant.*

No. 1 CA-CR 15-0251
FILED 7-19-2016

Appeal from the Superior Court in Coconino County
No. S0300CR201401006
The Honorable Jacqueline Hatch, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Robert A. Walsh
*Counsel for Appellee*

Coconino County Public Defender's Office, Flagstaff
By Brad Bransky
*Counsel for Appellant*

---

## OPINION

Judge Patricia A. Orozco delivered the opinion of the Court, in which Presiding Judge Diane M. Johnsen and Judge Kenton D. Jones joined.

---

**O R O Z C O**, Judge:

**¶1** Mark Haskie, Jr. (Defendant) appeals his convictions and sentences for two counts of aggravated assault — domestic violence, five counts of aggravated domestic violence, two counts of influencing a witness, and one count of kidnapping. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY[1]

**¶2** Officer Jordheim of the Flagstaff Police Department responded to a 911 call regarding domestic violence at a motel. At the motel, Officer Jordheim met a female, P.J., whose "eyes were swollen, pretty well bruised [with] various bruises and abrasions on her body and neck." P.J. told Officer Jordheim that Defendant caused her injuries after going through her cell phone and threatening "I told you I would kill you if you cheated on me."

**¶3** That same day, P.J. hand-wrote a statement at Officer Jordheim's invitation, explaining

> [Defendant] . . . beat me so bad in the face and other places in my body. He strangled me with a belt and also my [d]uffle bag [strap]. . . . He hit me so hard he loosen[ed] my front tooth. . . . When I was being strangled I couldn't breath[e] at all. . . . And this time I thought I was going to die and he kept saying why don't you just die.

Police also collected physical evidence from the motel room where P.J. and Defendant had been staying, including a belt, luggage strap, bloodied pillows and items belonging to Defendant.

---

[1] "We view the evidence in the light most favorable to affirming the jury's verdicts." *State v. Ortiz*, 238 Ariz. 329, 333, ¶ 2 (App. 2015).

¶4          Defendant was arrested nearly a year later. Shortly after the arrest, P.J. wrote two letters to the prosecutor recanting her earlier statement to police. In those letters, P.J. explained that she was drinking heavily at the time and suggested that her injuries occurred in a bar fight that she could not remember. She said she lied to police and took "full responsibility for [her] actions against [Defendant.]" She further stated that Defendant was innocent, and she would not testify against him because the charges were false.

¶5          Before trial, the State filed a motion in limine asking the court to admit testimony by Dr. Ferraro, its expert witness on domestic violence. The State intended to call Dr. Ferraro as a "cold" expert on domestic violence to help the jury understand why "[P.J. had] continued her relationship with the defendant, [had] given conflicting statements while the case has been pending, and [was] reluctant to testify[.]" Defendant objected to Dr. Ferraro's testimony, arguing it would constitute improper profile evidence and vouching. In reply, the State agreed to limit Dr. Ferraro's testimony to only "the victim's behaviors and the common reactions and coping strategies victims use in response to a violent incident" that might be misunderstood by a jury. The State also proposed a list of questions it intended to ask Dr. Ferraro at trial. Following a hearing, the trial court permitted Dr. Ferraro's testimony, but limited the examination to the State's proposed questions.

¶6          During its opening statement at trial, the State mentioned Dr. Ferraro's testimony, stating "you're going to hear from Dr. Kathleen Ferraro, who is an expert in domestic violence . . . [and she'll] tell you that it's not unusual for a victim to later change their story or to even help make a case go away."

¶7          At trial, Officer Jordheim testified about responding to the 911 call, and the State presented photos of the motel room, items found in the motel room and P.J.'s injuries. The State also presented recorded phone calls Defendant made from jail, including to P.J. before she recanted. In these conversations, Defendant dictated to P.J. an exculpatory story, and asked P.J. and other family members to write statements corroborating the story. Defendant also apologized to P.J., told her she was the only person that could get him out of jail and promised to marry her when he was released. Defendant suggested that if P.J. did not cooperate with police, the charges against him would be dropped. During one call, P.J. said, "well maybe you shouldn't have tried to kill me. . . . You know exactly what you did."

¶8          Dr. Ferraro testified that she was a "cold or blind" expert, meaning she had not reviewed any of the police reports in the case and was not going to testify about any of the particulars of the events in the case. The prosecutor asked a series of questions regarding characteristics of domestic violence victims. When asked, "is it unusual for someone who has been hurt by an intimate partner to return to that relationship[,]" Dr. Ferraro responded, "[i]t's not unusual. It is very common." She continued, "[t]here are many reasons [why,] and they vary by the individual, of course, and the type of relationship." Dr. Ferraro explained that some victims of domestic violence return to their abusers out of fear, retaliation, or threats. Other victims do not leave their abusers because of pressure from extended family or the victim's own shame. Dr. Ferraro further testified that chemical dependency and alcohol abuse complicate the decision about staying in an abusive relationship.

¶9          The prosecutor then asked "do victims ever tend to blame themselves for what happened?" Dr. Ferraro responded:

> Yes. That's a very common response of victims of domestic violence.
>
> . . .
>
> [P]art of it has to do with the manipulation of an abusive partner themselves because that's a very common dynamic of domestic violence, is the abusive partner will turn the violence around and say that if you hadn't done this or you had done that as I told you to do, this never would have happened, so it's your fault. And if you would just behave or comply with my wishes and my commands, then this wouldn't happen.

¶10          The prosecutor asked "[i]s it unusual for victims to later change their story?" Dr. Ferraro answered, "[n]o that is very typical[,]"adding that occurs for many of the same reasons that a victim would be reluctant to leave the relationship. In addition, she explained, the victim may be afraid of violent repercussions, pressure from the abuser, friends and extended family, intimidation to discontinue prosecution, and emotional and psychological manipulation.

¶11          Then the following exchange took place:

> Q.          . . . Are there occasions when someone may initially tell or give a report that isn't true?

A.     Yes.

Q.     . . . [I]s this incredibly common, more rare?

A.     In my own research and experience, it's very rare. But I have seen it happen. I know that it happens. What's much more common is for victims to minimize and deny that it has happened. That I see in almost every case. But the fabrication of events I have seen that happen, but it's unusual in the range of cases.

Q.     . . . [H]ave you ever seen efforts made to assist their partner in terms of getting them out of trouble or trying to make something go away, avoid accountability?

A.     Yes, often.

Q.     . . . Are those factors the same in terms of why women do that?

A.     They are very often the same. I've actually seen women go to jail and take the responsibility for a crime that their abusive partner has committed. And in part that is related to the psychological manipulation . . . where the abusive person will have them convinced that they'll get a much lighter sentence, that they maybe won't get a sentence at all.

¶12     P.J. was the State's next witness. She testified that she was still in a relationship with Defendant at the time of trial, she loved him and wanted to marry him. P.J explained that she did not remember who beat her up because she had been drinking at the time. P.J. testified that she initially blamed Defendant for her injuries because she was jealous, but that she in fact had cheated on him.

¶13     Before the jury began deliberations, the trial court instructed the jurors that they were not bound by any expert opinion and should give an opinion only the weight they believed it deserved. During closing arguments, the prosecutor never mentioned Dr. Ferraro, nor compared any aspect of her testimony to P.J. or Defendant.

¶14     The jury found Defendant guilty of two counts of aggravated assault — domestic violence, five counts of aggravated domestic violence, two counts of influencing a witness, and one count of kidnapping.

Defendant timely appealed and we have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution, and Arizona Revised Statutes (A.R.S.) sections 12-120.21.A.1, 13-4031, and -4033.A.1 (West 2016).[2]

## DISCUSSION

**¶15**    Defendant contends that Dr. Ferraro's testimony constituted impermissible offender profiling and vouching.   After objecting to the State's motion in limine to allow Dr. Ferraro to testify, Defendant did not object to Dr. Ferraro's testimony at trial.  "[W]here a motion in limine is made and ruled upon, the objection raised in that motion is preserved for appeal, despite the absence of a specific objection at trial."  *State v. Burton*, 144 Ariz. 248, 250 (1985).   Accordingly, Defendant's objection was preserved for appeal, and we review the trial court's decision to permit Dr. Ferraro's testimony for abuse of discretion.  *See State v. Ketchner*, 236 Ariz. 262, 264, ¶ 13 (2014).

**¶16**    "[A]n expert witness may testify about the general characteristics and behavior of [a defendant] and victim[] if the information imparted is not likely to be within the knowledge of most lay persons." *State v. Tucker*, 165 Ariz. 340, 346 (App. 1990).   Dr. Ferraro only offered general testimony to help the jury understand the evidence.   She was unfamiliar with the facts of the case and did not offer an opinion regarding this case.  *See State v. Salazar-Mercado*, 234 Ariz. 590, 591, ¶¶ 2, 6 (2014).

## I.    Offender Profiling

**¶17**    Defendant argues that Dr. Ferraro's testimony constituted impermissible offender profiling.  "Profile evidence tends to show that a defendant possesses one or more of an '"informal compilation of characteristics" or an "abstract of characteristics" typically displayed by persons engaged in a particular kind of activity."  *Ketchner*, 236 Ariz. at 264, ¶ 15 (quoting *State v. Lee*, 191 Ariz. 542, 544-45, ¶ 10 (1998)).  Profile evidence cannot be "used as substantive proof of guilt because of the 'risk that a defendant will be convicted not for what he did but for what others are doing.'"  *Id.* at 264-65, ¶ 15 (quoting *Lee*, 191 Ariz. at 545, ¶¶ 11-12).

**¶18**    Dr. Ferraro's testimony did not constitute impermissible profile evidence.  The Arizona Supreme Court addressed the issue of profile evidence in the context of domestic violence for the first time in *Ketchner*,

---

[2]    We cite the current version of applicable statutes when no revisions material to this decision have since occurred.

236 Ariz. at 264, ¶ 13.   In *Ketchner*, an expert witness[3] testified about "characteristics common to domestic violence victims and their abusers[.]" *Id.* at 264, ¶ 14.   Specifically, the expert testified regarding "separation assault" and "described risk factors for 'lethality' in an abusive relationship." *Id.*   The Arizona Supreme Court held that the testimony was inadmissible profile evidence because it went beyond "explain[ing] behavior by [the victim] that otherwise might be misunderstood by a jury." *Id.* at 265, ¶ 19.   Rather, the testimony "predicted an abuser's reaction to loss of control in a relationship." *Id.*   The Court found "[t]here was no reason to elicit this testimony except to invite the jury to find that Ketchner's character matched that of a domestic abuser who intended to kill or otherwise harm his partner in reaction to a loss of control over the relationship." *Id.*

**¶19**        Dr. Ferraro's testimony in this case is distinguishable from *Ketchner* because here, the testimony did not tend to show that Defendant possessed one or more of an informal compilation of characteristics typically displayed by domestic violence abusers.   Instead, her testimony was confined to the general counterintuitive behaviors of victims, and the factors that cause such behaviors.   In particular, Dr. Ferraro testified about victims returning to an abusive relationship, and victims taking responsibility for their abuse.

**¶20**        First, Dr. Ferraro testified that "[i]t's not unusual" for someone who has been hurt by an intimate partner to return to that relationship.   Dr. Ferraro opined "[t]here are many reasons [why,] and they vary by the individual, of course, and the type of relationship."   She further opined as to some of the factors that cause such behavior, such as fear, retaliation, threats, pressure from extended family, alcohol abuse and the victim's own shame.   Far from creating an informal compilation of characteristics of *abusers*, Dr. Ferraro's testimony helped explain counterintuitive behavior of *victims* that the jury may have misunderstood. This was especially helpful for the jury here because the nature of P.J.'s relationship with Defendant was squarely in question.   *Cf. Ketchner*, 236 Ariz. at 265, ¶ 19 (noting that expert testimony was not helpful to the jury because the nature of the abusive relationship was not in question).

**¶21**        Second, Dr. Ferraro testified that domestic violence victims tend to blame themselves, take responsibility for the abuse, or help their abusive partner avoid accountability.   She opined that these behaviors are

---

[3]        Dr. Ferraro was also the expert who testified in *Ketchner*.   *See* 236 Ariz. at 264, ¶ 13.

a result of manipulation by the abuser. Defendant argues that this testimony "epitomizes the domestic violence offender profiling . . . absolutely prohibited in *Ketchner*," particularly because evidence in this case matched Dr. Ferraro's testimony about how abusers manipulate victims.

**¶22** Defendant highlights that some evidence the State offered matched Dr. Ferraro's testimony. Indeed, evidence showed that Defendant manipulated P.J. by "turning the violence around" and convincing P.J. to help him get acquitted. Before the attack, Defendant went through P.J.'s phone and threatened to kill her if she ever cheated on him. Later, P.J. blamed herself for the attack, asserting that she, not Defendant, was the cheater. In phone calls from jail after his arrest, Defendant told P.J. that she was the only person that could get him released and that he needed P.J. to write a statement corroborating his exculpatory story. Then, in her letters to the prosecutor, P.J. changed her story and took "full responsibility" for the violence and her injuries. P.J. also blamed herself at trial.

**¶23** The purpose of expert testimony such as Dr. Ferraro's is to explain counterintuitive behaviors commonly seen in a victim of domestic violence. For that reason, it is not surprising — indeed it is expected — that the jury will hear evidence that the victim has behaved to a greater or lesser extent in accord with the testimony of a "cold" and "blind" expert such as Dr. Ferraro. Even though this evidence echoed some of Dr. Ferraro's testimony, her testimony did not tend to show that Defendant possessed "one or more of an informal compilation of characteristics" typically displayed by domestic violence abusers. *See Ketchner*, 236 Ariz. at 264, ¶ 15. Nor did the testimony "implicitly invite[] the jury to infer criminal conduct based on the described" conduct. *Id.* at 265, ¶ 17 (citing with approval *Ryan v. State*, 988 P.2d 46, 56-57 (Wyo. 1999)). Rather, Dr. Ferraro's testimony properly described general behaviors that were not likely to be within the knowledge of most lay persons. *See Tucker*, 165 Ariz. at 346. Accordingly, Dr. Ferraro's testimony did not constitute impermissible profile evidence.

## II.   Vouching

**¶24** Defendant also argues that Dr. Ferraro's testimony impermissibly vouched for P.J.'s credibility. Evidence that explains "why recantation is not necessarily inconsistent with the crime having occurred" helps the jury evaluate a victim's credibility. *State v. Moran*, 151 Ariz. 378, 384 (1986). But an "expert may neither quantify nor express an opinion about the veracity of a particular witness or type of witness." *Tucker*, 165 Ariz. at 346; *see also State v. Lindsey*, 149 Ariz. 472, 474 (1986) (noting that an

expert should not be "allowed to go beyond the description of general principles of social or behavioral science which might assist the jury in their own determination of credibility").[4] "Nor may the expert's opinion as to credibility be adduced indirectly by allowing the expert to quantify the percentage of victims who are truthful in their initial reports despite subsequent recantation." *Moran*, 151 Ariz. at 382.

¶25 The majority of Dr. Ferraro's testimony discussed only the social and behavioral factors bearing on a domestic violence victim's recantation, which does not constitute impermissible vouching. However, citing *Lindsey*, Defendant argues that Dr. Ferraro quantified P.J.'s credibility and "in no uncertain terms, told the jury that P.J.'s original accusatory report was true and her recantation false." But Dr. Ferraro did not testify that P.J.'s original report was true. She only testified in general terms that she "often" sees domestic violence victims assist their partners in avoiding accountability, and that it "is very typical" for victims to later change their stories.

¶26 *Moran* recognized that expert testimony "explaining why recantation is not necessarily inconsistent with the crime having occurred aid[s] the jury in evaluating the victim's credibility." 151 Ariz. at 384. In that case, a child sex abuse victim recanted after reporting numerous times that abuse was occurring. *Id.* at 380. An expert witness properly explained factors that could lead a child sex abuse victim to recant. *Id.* at 383-84. However, the expert impermissibly testified that the child's statements were truthful and her "behavior, including recantation, was typical of molested children." *Id.* at 379.

¶27 In *Lindsey*, an expert impermissibly testified about a victim's credibility, stating "most people in the field feel that it's a very small proportion [of incest victims] that lie." 149 Ariz. at 474. The expert opined that "the likelihood [of abuse] is very strong . . . I feel there's a preponderance of the evidence here." *Id.* The effect of this testimony was to "tell the jury who [was] correct or incorrect" and to opine on the question of guilt. *Id.* at 475 (internal quotation omitted). Thus, the testimony was improper. *Id.*

¶28 Although *Moran* and *Lindsey* involve child victims of sexual abuse rather than adult victims of domestic violence, those cases are

---

[4] "[O]pinions about witness credibility are nothing more than advice to jurors on how to decide the case." *State v. Boggs*, 218 Ariz. 325, 335 (2008) (internal quotation marks omitted).

instructive here.  The State concedes that Dr. Ferraro's testimony went beyond that permitted by *Moran*, and ventured into that prohibited by *Lindsey*, when she opined that "it's very rare" for a victim to give a false initial report, but that it is "much more common . . . for victims to minimize and deny that it has happened.  That I see in almost every case." That statement by Dr. Ferraro did not just explain why a victim's recantation was not necessarily inconsistent with abuse having occurred; instead, it commented directly on a victim's credibility.  Accordingly, we find this portion of Dr. Ferraro's testimony constituted impermissible vouching.

**¶29**        On the other hand, to the extent Dr. Ferraro testified in general terms about domestic violence victims, we find that testimony was admissible.  In contrast to *Lindsey*, Dr. Ferraro's testimony stated general information in relative terms that the jury could use to determine credibility.  *See Lindsey*, 149 Ariz. at 474 (quoting *State v. Chapple*, 135 Ariz. 281, 292 (1983) ("We believe that the 'generality' of the testimony is a factor which favors admission.") (overturned on other grounds by statute)).  Dr. Ferraro did not tell the jury who was correct or incorrect, nor did she opine as to Defendant's guilt.  *Cf. Lindsey*, 149 Ariz. at 474.  Furthermore, Dr. Ferraro did not give specific opinions regarding P.J.'s credibility, or opine as to whether P.J.'s behavior was consistent with abuse having occurred.  In fact, Dr. Ferraro testified that she had no knowledge of this case, and therefore could not testify about P.J. specifically.  *See State v. Herrera*, 232 Ariz. 536, 551, ¶ 36 (App. 2013) (permitting expert testimony and distinguishing *Lindsey* in part because expert "testified she had no knowledge of the particular facts and circumstances of the case"). [5]

---

[5]        The State urges us to apply fundamental error review to Dr. Ferraro's testimony concerning whether domestic victims tend to lie, citing *State v. Lichon*, 163 Ariz. 186, 189 (App. 1989), because Defendant did not object at trial.  In *Lichon*, a pretrial motion in limine did not preserve the issue on appeal because the motion was perfunctory, summarily ruled upon, and the judge who tried the case was different from the judge who ruled on the motion. *See id.*  Here, the State's motion in limine was thoroughly briefed and argued, the judge made a substantive ruling, and the judge who ruled on the motion also tried the case.  The cited testimony was not among the subject matters that the trial court ruled in limine that the State could inquire into at trial.  Thus, Defendant's failure to object to Dr. Ferraro's testimony at trial did not "deprive[] the court of a meaningful opportunity to consider the issue he now raises." *Id.*

## III.    Harmless Error

¶30    To the extent Dr. Ferraro's testimony was improper, we will not reverse Defendant's convictions and sentences if the error was harmless. *See State v. Henderson*, 210 Ariz. 561, 567, ¶ 18 (2005). "Harmless error review places the burden on the [S]tate to prove beyond a reasonable doubt that the error did not contribute to or affect the verdict or sentence." *Id.*

¶31    Although a small portion of Dr. Ferraro's testimony vouched for the credibility of domestic violence victims, her testimony did not invite the jury to conclude that Defendant was a domestic violence abuser. *Cf. Ketchner*, 236 Ariz. at 266, ¶ 19.  At no point during trial did the prosecutor compare Dr. Ferraro's testimony to Defendant or P.J.  Nor did the prosecutor implicitly ask the jurors to find that Defendant or P.J. acted in conformity with Dr. Ferraro's testimony.  The only time the prosecutor mentioned Dr. Ferraro's testimony was during her opening statement, when she said Dr. Ferraro would testify "it's not unusual for a victim to later change their story or to even help make a case go away."  However, the prosecutor did not emphasize this testimony.

¶32    Furthermore, Dr. Ferraro's "testimony was not the only information upon which the jury could rely to assess [P.J.'s] credibility." *Herrera*, 232 Ariz. at 552, ¶ 47.  Indeed, overwhelming evidence established Defendant's guilt. *See State v. Anthony*, 218 Ariz. 439, 446, ¶ 41 (2008) ("We can find error harmless when the evidence against a defendant is so overwhelming that any reasonable jury could only have reached one conclusion."). *Cf. Moran*, 151 Ariz. at 386 (holding that improper testimony was prejudicial because "[n]either physical evidence or any other direct evidence showed that [defendant] committed the crime.  The only evidence was the out-of-court statements, later recanted at trial").

¶33    Numerous witnesses testified during three days of trial in this case.  P.J. identified Defendant as her attacker on the 911 recording and in her initial statement.  The jury saw photos of P.J.'s injuries and her motel room. Witnesses testified about physical evidence found in the motel room corroborating P.J.'s initial statement, including DNA evidence.  The jury heard phone conversations between Defendant and P.J., and in one recording P.J. stated "well maybe you shouldn't have tried to kill me. . . . You know exactly what you did."  Finally, the trial court instructed the jury regarding expert witnesses, and we presume the jury followed that

instruction. *See State v. LeBlanc*, 186 Ariz. 437, 439 (1996). We conclude beyond a reasonable doubt that the jury would have convicted Defendant absent Dr. Ferraro's testimony. *See State v. Crane*, 166 Ariz. 3, 7 (App. 1990).

## CONCLUSION

**¶34**      For the foregoing reasons, we affirm Defendant's convictions and sentences.



Ruth A. Willingham · Clerk of the Court
FILED: AA