993 P.2d 1043

Reginald BEIJER, Petitioner,

v.

The Honorable Charles D. ADAMS, Judge of the Superior Court of the State of Arizona, In and For the COUNTY OF COCONINO, Respondent Judge.

State of Arizona, Real Party in Interest.

No. 1 CA–SA 98–0324.

Court of Appeals of Arizona,
Division 1, Department D.

Feb. 9, 1999.

Review Denied Nov. 30, 1999.

Law Office of Lee Brooke Phillips, P.C. by Lee Brooke Phillips, Flagstaff, Attorney for Petitioner.

Terence C. Hance, Coconino County Attorney by Jeffrey A. James, Deputy County Attorney, Flagstaff, Attorneys for Real Party in Interest.

## OPINION

KLEINSCHMIDT, Judge.

¶ 1 The Defendant, Reginald Beijer, was stopped on an interstate highway for a traffic infraction, and a consensual search of his car revealed drugs in a hidden compartment in the trunk. During his trial for transportation of narcotic drugs for sale, evidence was admitted that the Defendant's conduct fit the pattern of a drug courier. The trial court granted the Defendant's request for a mistrial because the admission of such evidence is improper under *State v. Lee*, 191 Ariz. 542, 959 P.2d 799 (1998). After the mistrial was granted, the Defendant moved to bar retrial on the grounds that the State, by presenting drug courier profile evidence, had engaged in intentional misconduct. The trial court denied that motion, and the Defendant brought this special action to reverse that order. Following oral argument, we accepted jurisdiction and denied relief, stating that this opinion would follow.

## FACTS AND PROCEDURAL HISTORY

¶ 2 A detailed knowledge of the testimony of the arresting officer, how that testimony was elicited, and the sequence in which it was presented is necessary to an understanding of the case. Most of the improper testimony came in without any objection from the defense because defense counsel was unaware of the *Lee* decision until midway through the trial.

¶ 3 On direct examination by the prosecutor, the officer, a highway patrol officer, testified about his training and experience. Among other things, he said that one of his principal duties was drug interdiction and that he had attended an extensive training program called "Desert Snow" sponsored by the California Highway Patrol on how to recognize drug couriers. He said that the instructor discussed methods of concealment, how drugs flow throughout the United States, where they are stored, and what parts of the country they are transported to, and talked about conduct, like nervousness, that indicates that a crime is being committed. He also testified that he had attended two other drug interdiction conferences and that he now trains other officers in the subject. The officer also testified that, in the five years that he has been a highway patrol officer, he has made about thirty-five arrests for drug trafficking and has participated in about 120 other such arrests.

¶ 4 The officer testified that on a day in May 1998, he was on patrol on Interstate 40, east of Flagstaff, when he observed the Defendant make an unsafe lane change. He pulled the Defendant over, and when he approached the passenger's side of the Defendant's car, he noticed

> kind of, basically two separate things. I was noticing the driver's—the way he was acting, and I was noticing things in the vehicle, both the things that we are trained to look for at drug interdiction.

¶ 5 He went on to say that the Defendant was extremely nervous and was shaking as he fumbled through his wallet. He also noticed that the Defendant's clothes were somewhat dirty and that there was a strong fragrant odor in the car. He observed a

bottle of hair spray on the seat. The officer also noticed a number of snack wrappers on the floorboard on the right side of the car. The Defendant gave the officer a temporary California driver's license bearing the name Samuel Goretz with no photograph on it. The registration and title to the car were issued by the State of Tennessee to an Antonieta Rossi.

¶ 6 The officer testified that in the course of his career he has made as many as 8,000 traffic stops. He said that most people are nervous when they are first stopped, but that they calm down, especially after he begins to talk to them. He said that if such people are shaking, it was usually to a "small degree," but that the Defendant's shaking was extreme.

¶ 7 The officer asked the Defendant to step out of the car and as the Defendant complied, the officer noticed that his clothes were very dirty, as if they had been worn for quite a few days. He also noticed that the Defendant's hair was messy, although he smelled the odor of freshly-sprayed hairspray. The Defendant's nervous behavior continued, and he could not stand still; he was waving his arms around and kicking rocks by the roadside. This demeanor did not change when the Defendant was told that he was to receive just a warning ticket. In the officer's experience, this was unusual because most people relax when they realize they are not going to receive a citation.

¶ 8 The officer testified that he learned in drug interdiction training to engage the people he stops in conversation to see whether anything they say arouses his suspicion. In this case, the Defendant told him that he was going to visit his ex-wife in Tennessee to finish paying for the car he had bought from her and get a receipt. The officer testified that this explanation sounded suspicious to him because it was something that could be done through the mail.

¶ 9 At this point, the officer went back to his car to run a radio check on the vehicle. He said,

I was building a suspicion in my mind and observing things and keeping track of them, and towards the end of the stop I decided that I did want to search the vehicle. Again, when I was sitting in the car, I was inspecting the documents. This added to my suspicion and helped reaffirm that I did want to search it.

¶ 10 The Defendant agreed to allow the officer to search his car, and when he signed the consent form he was shaking badly. The shaking was also obvious when the Defendant tried to unlock the trunk of the car.

¶ 11 During the course of the search, the officer found a California identification card bearing the Defendant's name, Reginald Beijer, and his photograph. Ultimately, the officer found a hidden compartment in the trunk that contained a large amount of cocaine.

¶ 12 On cross-examination, defense counsel asked some questions designed to suggest that the Defendant had behaved normally for a person who is stopped and questioned. On redirect, the officer testified that cocaine has a distinct odor but that he has never smelled it in a suspect's car because it is too well packaged; normally, what he smells is a masking agent.

¶ 13 The court then invited questions from the jury. The only objection defense counsel interposed to any of the questions was that they had already been answered. The jury asked about the value of the car the Defendant was driving and was told that it was $8,000. They asked whether the officer had, in his experience with drug interdiction, seen hair spray or similar items used to conceal the smell of drugs, and the officer responded that he had. The jury also asked why snacks and snack wrappers were suspicious, and the officer answered as follows:

It's part of what leads to the big picture of a drug courier. How these are people who are transporting a car with contraband in it from point A to point B. They are not interested in—for the most part they're not people who pull off of the road to go to a restaurant to eat because that you have sometimes millions of dollars of contraband in the car. They will stock up on snacks, get on the road, and head across country, eat on the way and usually drive straight through. When I start seeing a buildup of things like this in conjunction with other indicators I am looking at, it means some-

thing to me. By itself—snack wrappers in and of itself, it really doesn't mean anything, but when you add to it into the big picture of things it does mean something to me.

¶ 14 The next day, and before the case went to the jury, defense counsel made a motion for a mistrial based on the recent decision of the supreme court in *State v. Lee.* He had first learned of *Lee* that morning in a conversation with a member of the public defender's staff. *Lee,* in broad terms, prohibits the prosecution from introducing "drug courier profile" evidence to prove that the defendant was trafficking in drugs. The prosecutor acknowledged that he had been aware of the holding in *Lee,* but he argued that *Lee* does not prohibit the State from presenting evidence of such things as a defendant's nervousness and the smell of hair spray. He also argued that the only drug courier profile evidence was admitted in response to the jury's question and said that he did not know whether he had a duty to object to that question but that he had not known what the officer's testimony was going to be.

¶ 15 After reviewing *Lee,* the trial court granted the Defendant's motion for a mistrial. The discussion that ensued reflected some confusion on the part of the judge and counsel as to the parameters of *Lee.* Subsequently, the Defendant's motion to bar a retrial was denied, and the time set for a new trial was vacated to allow the Defendant to bring this special action challenging that ruling. In the discussion that follows, we explain why a new trial is not barred, and we attempt to flesh out *Lee* with an explanation of how it governs the admissibility of the evidence produced in this case.

### THE CIRCUMSTANCES DO NOT BAR A RETRIAL

■ ¶ 16 In *Pool v. Superior Court,* 139 Ariz. 98, 108–09, 677 P.2d 261, 271–72 (1984), our supreme court clearly established that if a mistrial is granted as a result of conduct that the prosecutor knew or should have known would prejudice the defendant and that could not be cured short of a mistrial, the double jeopardy clause of the Arizona Constitution bars a retrial. The prosecutor

must have intended to prejudice the defendant, or have acted with indifference to whether prejudice would result. Mere negligence, mistake, legal error, or insignificant impropriety on the part of the prosecutor is not enough to bar retrial.

¶ 17 To assess whether the prosecutor transgressed, and if so, to a degree that bars retrial, requires an analysis of *Lee* and how it bears on what happened in this case. In *Lee,* the defendant was arrested at the Phoenix airport when a search of his luggage revealed a substantial quantity of marijuana. *Id.* at 543, 959 P.2d at 800. At trial, the court admitted evidence relating to a drug courier profile, which the court described as an " 'informal compilation of characteristics' or an 'abstract of characteristics' typically displayed by persons trafficking in illegal drugs." *Id.* at 544, 959 P.2d at 801. The profile evidence included testimony about "source" cities and "demand" cities, testimony that drug traffickers preferred hard-sided suitcases, and testimony about the gender and age of the typical courier, the lack of identification on luggage, and the time of day of flights favored by traffickers. *Id.* at 545–46, 959 P.2d at 802–03.

¶ 18 The supreme court said that such evidence should not have been admitted. It pointed out that at trial, as opposed to a hearing on a motion to suppress, the reasons for the arresting officers' suspicions are not relevant, and said that it was error to admit any of this evidence as substantive proof of guilt because it " 'creates too high a risk that a defendant will be convicted not for what he did but for what others are doing.' " *Id.* (quoting *State v. Cifuentes,* 171 Ariz. 257, 257, 830 P.2d 469, 469 (App.1991)).

■ ¶ 19 In applying the rule of *Lee* to the facts of this case, it is clear that the most egregious single error came when the officer explicitly testified about "the big picture of the drug courier" in response to the jury's question as to why the presence of snack food wrappers made the officer suspicious. This error cannot be laid at the prosecutor's doorstep unless the prosecutor should have told the court not to allow the officer to answer the question. While the prosecutor,

who was familiar with *Lee,* probably should have recognized the potential for danger in the question, he told the court that he did not know how the officer was going to answer the question. In denying the Defendant's motion to bar a new trial, the trial judge necessarily accepted the prosecutor's explanation, even though he did not expressly say so. *See Lee Dev. Co. v. Papp,* 166 Ariz. 471, 476, 803 P.2d 464, 469 (App.1990). We cannot say that this inherent finding was an abuse of discretion by the trial judge.

¶ 20 The officer's answer to the jury's question was not, however, the only evidence that violated the rule adopted by *Lee.* Some of the testimony, even though it did not expressly refer to drug couriers, was nonetheless objectionable because the State's heavy emphasis on the officer's training in interdiction, coupled with the testimony about the factors that made the officer suspicious, told the jury, in effect, that the Defendant fit the drug courier profile. None of the testimony about specialized training in drug interdiction should have been admitted. It was irrelevant and went a long way toward creating an impermissible inference. Nor should reference to why the officer's suspicion was aroused have been admitted. *Lee* expressly holds that such evidence is irrelevant. *Id.* at 545, 959 P.2d at 802.

¶ 21 None of the testimony about where drugs originate and where they are distributed should have been admitted. *Lee* expressly forbids the admission of such evidence. *Id.*

¶ 22 Evidence of a person's nervousness has generally been held to be admissible to show that the person is aware that he is engaging in unlawful conduct. *See State v. Killean,* 184 Ariz. 164, 170, 907 P.2d 550, 556 (App.1995), *vacated on other grounds,* 185 Ariz. 270, 915 P.2d 1225 (1996). In *State v. Magner,* 191 Ariz. 392, 956 P.2d 519 (App. 1998), another panel of this court, citing *United States v. Fernandez,* 18 F.3d 874 (10th Cir.1994), pointed out that courts must be wary of attaching too much significance to nervousness because most people are nervous when a police officer stops them and asks potentially incriminating questions.

*Magner,* citing other authority, explains that when specific factors, shaky hands for instance, objectify and quantify "dramatic" nervousness, evidence of such may be admitted. *Id.* at 397, 956 P.2d at 524. Here, the officer acknowledged that although most people he stops are somewhat nervous at first, they become less so as they interact with the officer. He referred to a number of factors that led to the conclusion that the Defendant was nervous beyond the norm, and this evidence was properly admitted. Admissibility of such evidence does not, of course, extend to testimony concerning the officer's conclusions about nervousness based on his drug interdiction training.

¶ 23 The evidence about the smell of hair spray, the presence of snack wrappers, and the Defendant's dirty clothes is admissible so long as it is not tied to what other drug couriers do. While the inference to be drawn from snack wrappers and dirty clothes—that the Defendant was driving nonstop because he did not want to risk having his contraband stolen—is very weak, we cannot say that the prosecutor should be precluded from arguing it.

¶ 24 The Petitioner relies on *Magner* to argue that evidence of nervousness and snack wrappers should not be admitted because they are not relevant. In *Magner,* the question was whether a highway patrol officer had probable cause to search a vehicle he had stopped for a traffic infraction. In support of probable cause, the officer testified that the defendant refused to make eye contact; that his eye twitched when he did look at the officer; that he was unusually upset at being stopped; that the vehicle registration was on the seat of the car suggesting that there might be a gun in the glove box; that the defendant was wearing a tie but had on jeans and sneakers and so might be trying to pass himself off as a businessman to passing policemen; that the defendant was coming from Tucson, a source city for illegal drugs; that the defendant's car was dirty which, based on the officer's training, he associated with criminal activity; that the defendant was carrying luggage in the back seat as opposed to the trunk; and that the defendant's account of his stay in Tucson

was confusing.  *Id.* at 397–400, 956 P.2d at 524–27.  In considering this evidence, another panel of this court carefully reviewed all the factors on which the officer relied and pointed out that equally strong or stronger inferences of innocent behavior could be drawn from them.  A majority of the panel concluded that the totality of the circumstances would not support a reasonable suspicion of criminal behavior.  *Id.* at 400, 956 P.2d at 527.

¶ 25 We agree with the decision the majority reached in *Magner*, but find that it differs from the one now before us.  Here, the presence of the drugs in the trunk of the car the Defendant was driving was sufficient, in and of itself, to support a conclusion beyond a reasonable doubt that he was knowingly transporting the drugs.  See *State v. Harris*, 9 Ariz.App. 288, 290, 451 P.2d 646, 648 (1969), and cases cited therein.  Evidence such as snack wrappers and dirty clothes, without more, could never amount to probable cause, but that is not to say that it cannot add to the totality of circumstances that convinces a trier of fact that criminal activity is afoot.

¶ 26 In summary, some of the evidence the prosecutor presented violated *Lee*. Because the precise parameters of that case are subject to some interpretation, and because the trial judge was in the best position to evaluate the prosecutor's explanation of his conduct, we are unable to say that this record compels the conclusion that the prosecutor so overstepped the bounds that a retrial is barred.  We therefore deny the relief requested.

CONCURRING: REBECCA WHITE BERCH, Judge, and RUDOLPH J. GERBER, Judge.