396 P.3d 611

**STATE of Arizona, Appellee,**

v.

**Erick Antonio ESCALANTE, Appellant.**

**No. 1 CA-CR 15-0684**

Court of Appeals of Arizona, Division 1.

FILED 5/11/2017

Arizona Attorney General's Office, Phoenix, By Eric Knobloch, Counsel for Appellee

Yavapai County Public Defender's Office, Prescott, By John David Napper, Michelle DeWaelsche, Nicole S. Murray, Counsel for Appellant

Judge Jon W. Thompson delivered the opinion of the Court, in which Presiding Judge Diane M. Johnsen and Judge Paul J. McMurdie joined.

## OPINION

THOMPSON, Judge:

¶ 1 Erick Antonio Escalante (Escalante) appeals from his convictions for transporting a dangerous drug (methamphetamine) for sale, a class 2 felony (count 1), possession or use of drug paraphernalia (methamphetamine related), a class 6 felony (count 2), tampering with physical evidence for disposing of methamphetamine, a class 6 felony (count 3), misconduct involving weapons during the commission of the felony alleged in count 1, a class 4 felony (count 5), and various misconduct involving weapons charges due to his status as a prohibited possessor, all class 4 felonies (counts 4, 6, 7, and 8).[1] For the reasons that follow, we affirm.

### FACTUAL AND PROCEDURAL HISTORY

¶ 2 In April 2014, an informant told Detective Sinn that Escalante was one of multiple people suspected of selling drugs in the Verde Valley. In November of that year, Sergeant Braxton–Johnson contacted Detec-

---

1. Count 4: possession of a hand-gun; count 6: possession of a machete; count 7: possession of an "Elk Ridge" knife; count 8: possession of another knife.

tive Sinn, reporting he had received calls from concerned citizens suggesting ongoing illegal drug activity at Escalante's apartment in Cottonwood and that Escalante had installed a camera outside the apartment. Detective Sinn confirmed there was a camera outside Escalante's apartment. Neither the informants nor any of the concerned citizens testified at trial.

¶ 3 The same month, the detective and the sergeant began conducting surveillance on Escalante's apartment. Detective Sinn testified that during their surveillance they noticed a high volume of short-duration vehicle and foot traffic going to and from Escalante's residence. He also reported receiving "several" concerned citizen tips reported to various officers—including Sergeant Braxton, Detective Scott, Officer Scarim and Detective Dominguez—between November 2014 and January 2015, about Escalante and his likely drug activity. Detective Sinn used these tips and the information gleaned from surveilling Escalante's home to secure a warrant on January 13, 2015, allowing him to place a tracking device on Escalante's truck. Sinn attached the device the next day and monitored Escalante's truck for the next seven days. On January 21, officers stopped a vehicle leaving Escalante's home for speeding. The driver consented to a search of his vehicle; no drugs or indicia of drugs were found, but the driver had $940 in his wallet.

¶ 4 Later that night, the tracking device alerted that Escalante's truck traveled on Interstate 17 (I–17) to Phoenix, to an address near 35th Avenue and Indian School Road. The vehicle stayed for about 15 to 20 minutes before heading back in the direction of Yavapai County. Detectives decided to follow Escalante's truck once it returned to the Camp Verde area and then to conduct a traffic stop if they saw any traffic violation.

¶ 5 Yavapai County Sheriff Sergeant Rumpf eventually observed a truck northbound on I–17 matching the description of Escalante's truck exit from the freeway toward Cottonwood with an illegal blue license-plate light. Sergeant Rumpf and another officer followed. Escalante traveled west on Highway 260, but before reaching Cotton-

wood, took a right turn onto Prairie Lane and headed into a residential area, eventually taking "a sharp left across both lanes of traffic and stopp[ing] in the middle of the road." At that point, officers stopped the truck.

¶ 6 Sergeant Rumpf informed Escalante he was stopped for having an illegal license-plate light. He observed a firearm in Escalante's driver door. Deputy Jeff Bowers subsequently arrived with a canine. The canine alerted to the odor of narcotics near Escalante's driver door, but no narcotics were found in the truck or on Escalante's person. Neither were drugs found outside the truck after an initial search of the roadway and surrounding area.

¶ 7 About ten or fifteen minutes later, Detective Sinn arrived and read Escalante his *Miranda*[2] rights. When Detective Sinn asked Escalante where he was coming from, Escalante responded "Camp Verde," but would not respond to specific questions as to what he was doing in Camp Verde, asserting that had no relevance to the situation. Escalante also mentioned he knew the officers were following him as he drove.

¶ 8 Officers arrested Escalante and his vehicle was taken to be searched. The search resulted in the discovery of, among other items, a loaded magazine belonging to the firearm in the driver's-side door, confirmed to be a .380 caliber semi-automatic hand-gun; various knives, including a 3– or 4–inch pocket knife; a machete; and a "flip" cellphone.

¶ 9 Approximately two hours after Escalante was stopped, Deputy Bowers returned to the scene to search the roadway further. The deputy traveled eastbound on Highway 260 and made a left onto Prairie Lane where Escalante had been driving. Just after Deputy Bowers turned left onto the lane, he "saw what appeared to be a [bag with] white substance laying on ... the yellow double yellow line." The substance was later confirmed to be roughly 47.8 grams (the equivalent of 0.105381 pounds) of methamphetamine. Police officers subsequently searched the truck

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct.　1602, 16 L.Ed.2d 694 (1966).

again and found a digital scale bearing meth-amphetamine residue.

¶ 10 Escalante was charged with the eight counts noted above. At his request, the court severed the various counts into two trials—a jury heard counts 1, 2, 3 and 5, and a bench trial ensued on counts 4, 6, 7 and 8. Esca-lante was found guilty on all counts. He timely appealed to this court. We have juris-diction pursuant to Article 6, Section 9, of the Arizona Constitution and Arizona Revised Statutes (A.R.S.) sections 12–120.21(A)(1) (2016), 13–4031 (2010) and –4033(A) (2010).

## DISCUSSION

¶ 11 On appeal, Escalante argues the trial court erred by allowing the officers to give "drug courier profile" testimony. Be-cause Escalante failed to object to this al-leged error at trial, we review his claim for fundamental error. *See State v. Henderson,* 210 Ariz. 561, 567, ¶ 19, 115 P.3d 601, 607 (2005). On fundamental error review, Esca-lante "bears the burden to establish that '(1) error exists, (2) the error is fundamental, and (3) the error caused him prejudice.'" *State v. James,* 231 Ariz. 490, 493, ¶ 11, 297 P.3d 182, 185 (App. 2013) (citations omitted). Funda-mental error review involves a fact-intensive inquiry, and the showing required to estab-lish prejudice "therefore differs from case to case." *Henderson,* 210 Ariz. at 568, ¶ 26, 115 P.3d at 608.

¶ 12 At trial, the state called multiple po-lice officers to testify. Much of their testimo-ny focused on drug trafficking methods, drug traffickers and drug trafficking organizations as informed by their experiences and drug interdiction training. The officers testified about "source cities," reportedly including metropolitan Phoenix—and identified the area around 35th Avenue and Indian School Road to which Escalante had traveled as a "known active drug area." The officers testi-fied about drug corridors used for trafficking drugs, which they said include the I–17, which Escalante took to Phoenix. The offi-cers stated drug traffickers sometimes use surveillance equipment outside their resi-dences, presumably like the camera found outside Escalante's apartment. They talked about the presence of high-volume, short-term traffic outside homes used for drug dealing. They identified "heat-runs" as coun-ter-surveillance driving techniques used by drug traffickers and testified Escalante also used such techniques. One officer testified that in assisting with the initial search of Escalante's vehicle, based on his training and experience, he observed "several vehicle indi-cators as far as—or what is consistent with drug trafficking or drug activity." Officers testified drug traffickers usually carry weap-ons while transporting drugs—as one testi-fied "there's a direct nexus between weapons, violence and drugs." They stated that drug traffickers use scales to weigh the drugs for sale and purchase, and that the type of cell-phone found in Escalante's truck was com-monly used by drug dealers.

¶ 13 Citing authority from several other jurisdictions, the state argues this testimony was not improper drug courier profile evi-dence, but rather admissible *modus operandi* evidence. We disagree with the state because even if the officers' testimony constituted *modus operandi* evidence, it was improper because the operation of drug trafficking or-ganizations was largely irrelevant to the charges against Escalante. *See State v. Gon-zalez,* 229 Ariz. 550, 551, ¶ 1, 278 P.3d 328, 329 (App. 2012) (holding that "expert testi-mony as to the modus operandi of a drug organization may, *depending upon the facts of the case,* be admitted as evidence") (em-phasis added).

## I. Whether the officers' testimony was proper *modus operandi* evidence

¶ 14 The principles distinguishing drug courier profile evidence from *modus operan-di* evidence guide our analysis of the officers' testimony, particularly as to Escalante's con-viction for transport of a dangerous drug for sale, in violation of A.R.S. § 13–3407 (2016) (count 1).

¶ 15 Drug courier profile evidence in-formally or abstractly describes characteris-tics "displayed by persons trafficking in ille-gal drugs." *State v. Lee,* 191 Ariz. 542, 544, ¶ 10, 959 P.2d 799, 801 (1998) (citations omit-ted). This evidence is "a loose assortment of general, often contradictory, characteristics

and behaviors...." *Id.* (citing Mark J. Kadish, *The Drug Courier Profile: In Planes, Trains, and Automobiles; And Now in the Jury Box*, 46 Am. U.L. Rev. 747, 748 (1997)). The use of this evidence as substantive proof of guilt has been condemned, *id.* at 545, ¶ 12, 959 P.2d at 802 (citing *State v. Walker*, 181 Ariz. 475, 481, 891 P.2d 942, 948 (App. 1995)), even though it may be "offered *in the context of suppression and probable cause hearings*, where law enforcement's justifications for a stop, arrest, or confiscation is at issue," *id.* at 545, ¶ 11, 959 P.2d 799 (emphasis added). In agreeing that drug courier profile evidence is impermissible *as substantive proof*, we have concluded that the "use of profile evidence to indicate guilt ... creates too high a risk that a defendant will be convicted not for what he did but for what others are doing." *Gonzalez*, 229 Ariz. at 553, ¶ 12, 278 P.3d at 331 (quoting *State v. Cifuentes*, 171 Ariz. 257, 257, 830 P.2d 469, 469 (App. 1991)).

¶ 16 We have previously stated that *Lee* "in broad terms, prohibits the prosecution from introducing 'drug courier profile' evidence to prove that [a] defendant was trafficking in drugs" or from presenting evidence and tying it "to what other drug couriers do." *Beijer v. Adams ex rel. Cty. of Coconino*, 196 Ariz. 79, 82–83, ¶¶ 14, 23, 993 P.2d 1043, 1046–47 (App. 1999). In *Beijer*, this court found that testimony about an officer's specialized training in drug interdiction was "irrelevant and went a long way toward creating an impermissible inference," and when coupled with testimony about why the officer's suspicions were aroused, in effect, told the jury that "the Defendant fit the drug courier profile." *Id.* at 83, ¶ 20, 993 P.2d at 1047. We noted that *Lee* expressly forbids testimony about where drugs originate and where drugs are distributed. *Id.* at ¶ 21, 993 P.2d at 1047.

¶ 17 We also recognized circumstances in which similar evidence may be admissible as *modus operandi* evidence. *See Gonzalez*, 229 Ariz. at 554, ¶ 13, 278 P.3d at 332 (citing *United States v. Cordoba*, 104 F.3d 225, 230 (9th Cir. 1997)) (reaffirming that *modus operandi* evidence is "properly admitted to assist [a] jury in understanding the *modus operandi* of a drug trafficking organization"

in a case where the defendant and another individual were found with three plastic containers containing a total of 2.5 pounds of methamphetamine, and defendant denied knowing the drugs were in the car); *see State v. Salazar*, 27 Ariz.App. 620, 624–25, 557 P.2d 552, 556–57 (1976) (holding admissible expert testimony describing the common counter-surveillance techniques used by narcotics dealers in a case where four co-defendants were charged with conspiracy to sell and transport heroin).

¶ 18 In *Gonzalez*, where the defendant had denied knowing drugs were in his car, this court affirmed the trial court's admission as *modus operandi* evidence of a police sergeant's testimony that provided circumstantial evidence of the defendant's knowledge of the drugs. 229 Ariz. at 551, 554, ¶¶ 1, 15, 278 P.3d at 329, 332. The sergeant testified "that drug-trafficking organizations, like legitimate businesses, have a profit motive, and do not 'typically' entrust $112,000 worth of their drugs to an 'unknown transporter.'" *Id.* at 553, ¶ 8, 278 P.3d at 331.

¶ 19 There, the sergeant's testimony was not offered to show the defendant "was guilty because he fit the characteristics of a certain drug courier profile[,]" but was instead offered to establish general facts about drug trafficking organizations that served to undercut the asserted defense theory. *Id.* at 554, ¶ 15, 278 P.3d at 332 (quoting *Cordoba*, 104 F.3d at 229–30). This court concluded that, given the facts of that case and considering the asserted defense, the "testimony was proper because it was limited to the general practices of drug organizations." *Id.* at ¶ 16; *see also State v. Garcia–Quintana*, 234 Ariz. 267, 269–70, 273, ¶¶ 7, 29, 321 P.3d 432, 435–36, 438 (App. 2014) (holding that testimony regarding common counter-surveillance techniques used by drug trafficking organizations to smuggle drugs into the country was admissible to show "how the actions of Defendant fit into the modus operandi of a drug trafficking organization[,]" where the defendant claimed he was not part of a drug trafficking organization and that he had not carried the several backpacks full of marijuana he was found lying near in the desert).

¶ 20 As demonstrated, case law suggests that *modus operandi* testimony typically is admissible only when a defendant was found with large quantities of drugs and asserts, in defense, that he had no knowledge of the drugs.[3] Under those circumstances, what drug trafficking organizations do is relevant.[4] This is not that kind of case.

¶ 21 As Escalante points out, at no point did the state allege he was transporting drugs as part of a drug trafficking organization. Further, as a factual matter, Escalante was not found with drugs on his person, or in his vehicle. Additionally, the amount of the methamphetamine found on the road that led to the charge in count 1 is small by comparison to the large quantities of drugs that ordinarily may permit *modus operandi* drug trafficking testimony, as shown in the cited cases. Nor did Escalante assert a lack of knowledge defense, as in *Gonzalez* and the other cited cases, that might allow the supposed *modus operandi* evidence offered by the state. Moreover, unlike in *Salazar*, *see supra* ¶17, Escalante was not charged with drug conspiracy. *See United States v. Varela–Rivera*, 279 F.3d 1174, 1179 (9th Cir. 2002) ("[E]xpert testimony on the modus operandi of drug trafficking organizations is inadmissible in cases where, as here, the defendant is not charged with conspiracy to distribute drugs.").

¶ 22 We are not persuaded by the cases from other jurisdictions the state cites to support its position that the officers' testimony constituted admissible *modus operandi* evidence. Each of those cases allowed *modus operandi* evidence in situations involving drug distribution organizations. *See United States v. Spotted Elk*, 548 F.3d 641, 662 (8th Cir. 2008) (involving the operation of a "drug trafficking business" where testimony about the use of plastic wrap and grease used to mask odors on drugs and drug money from K–9 units was held to be permissible *modus operandi* evidence); *United States v. Wash-*

*ington*, 44 F.3d 1271, 1283 (5th Cir. 1995) (involving a "drug distribution ring," and holding, "an experienced narcotics agent may testify about the significance of certain conduct or methods of operation unique to the drug distribution business, as such testimony often is helpful in assisting the trier of fact understand the evidence"). We therefore hold the officers' testimony cannot be deemed admissible *modus operandi* evidence in the context of this case.

¶ 23 Accordingly, even if we were convinced by the state's additional argument that much of the officers' testimony constituted foundation in support of their expert opinions on drug trafficking, to the extent the officers' testimony, foundational or otherwise, pertained to the operations and methods of drug trafficking organizations not at issue in this case, it was irrelevant and therefore not allowed as *modus operandi* evidence.

¶ 24 In support of its position, the state further relies on a decision from the Court of Appeals for the D.C. Circuit for the proposition that experts are permitted to equate abstract patterns of conduct to specific cases "to the point of testifying that the defendant was involved in criminal conduct." *United States v. Boney*, 977 F.2d 624, 629 (D.C. Cir. 1992) (citing *United States v. Carson*, 702 F.2d 351 (2d Cir. 1983)). The D.C. Circuit's proposition is contrary to our precedent. *See, e.g., Fuenning v. Superior Court*, 139 Ariz. 590, 605, 680 P.2d 121, 136 (1983) (holding that a witness may not testify as to whether a defendant is innocent or guilty). We also specifically reject, as contrary to our jurisprudence, the state's argument that the statements referencing the area of Phoenix to which Escalante traveled as a "known drug area" did not constitute inadmissible profile evidence. *See Beijer*, 196 Ariz. at 83, ¶ 21, 993 P.2d at 1047 (disallowing "testimony about where drugs originate and where they are distributed").

---

3. This statement should not be deemed to suggest that *modus operandi* evidence would not be permissible in a case presenting different facts from those present here.

4. *See also Garcia–Quintana*, 234 Ariz. at 271, ¶ 13, 321 P.3d at 436 (noting that *modus operandi* evidence "focuses on the usual patterns or methods used by a criminal gang or organization to commit a crime [,]" and is "properly admitted to assist the jury, [as the trier of fact,] in understanding the modus operandi of a drug trafficking organization") (internal quotations and citations omitted).

**382**

## II. Whether the officers' testimony was impermissibly used as substantive evidence of guilt (i.e., improper drug courier profile evidence), and if so, does that error amount to fundamental and prejudicial error

¶ 25 As to each relevant count, we further consider (1) whether the state offered the officers' drug courier profile statements *as substantive evidence* of Escalante's guilt, and if so, (2) whether Escalante has shown fundamental and prejudicial error. We conclude that while the record suggests the state impermissibly used the officers' testimony as substantive evidence of Escalante's guilt as to count 1, Escalante has not met his burden under fundamental error review as to any of the counts at issue.

¶ 26 Escalante argues that the state's references to the officers' drug courier profile evidence, from the opening statements through closing arguments in the trial, substantively affected the jurors' decisions and thus constituted fundamental prejudicial error. He contends that questions posed by the jurors indicate he was prejudiced by the officers' statements and the state's presentation of that evidence. The state argues that even if the statements should not have been admitted, the jury would have nonetheless convicted Escalante due to the other "overwhelming" evidence.

¶ 27 As an initial matter, we note Escalante only argues that the evidence prejudiced the jury's consideration of the charges it was tasked to decide; he thus offers no viable challenge to his convictions by the court on counts 4, 6, 7, and 8. As to the remaining counts (counts 1 through 3 and count 5), we view the evidence in the light most favorable to sustaining the jury's verdicts, as we are required to do on appeal. *See State v. Nelson*, 214 Ariz. 196, 196, ¶ 2, 150 P.3d 769, 769 (App. 2007).

### A. Count 1
#### 1. The officers' testimony constituted substantive evidence as to count 1.

■ ¶ 28 To obtain a conviction for transporting a dangerous drug for sale, the state had to prove that Escalante knowingly "transport[ed] for sale, import[ed] into this state, offer[ed] to transport for sale or import into this state, sell, transfer or offer to sell or transfer a narcotic drug." A.R.S. § 13–3408(A)(2), (7) (2010). "Knowingly" means that a defendant acted with awareness of or belief that his conduct is of that nature or the circumstances of his conduct constitute the offense. *See* A.R.S. § 13–105(10)(b) (2016). The state had the burden to prove each element of this crime beyond a reasonable doubt. The reasonable doubt standard requires evidence sufficient to satisfy each element of the crime and to convince a factfinder of the defendant's guilt "with utmost certainty." *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

■ ¶ 29 As to count 1, viewing the trial in its entirety, the state used the officers' statements to paint Escalante's actions as those of a drug trafficker. The state's opening statement and closing argument repeatedly referenced the officers' statements and forcefully drew parallels between the described conduct of drug traffickers and Escalante's behavior. Given that we have concluded, contrary to the only justification offered by the state for the evidence, *supra* ¶¶13, 22, that this testimony is not proper *modus operandi* evidence in the context of this case, the only purpose of the testimony was to create parallels between drug traffickers and Escalante. *See Lee*, 191 Ariz. at 546, ¶ 18, 959 P.2d at 803 (stating evidence "should not have been admitted in the first instance [where] its only purpose was to suggest that because the accuseds' behavior was consistent with that of known drug couriers, they likewise must have been couriers").

¶ 30 In its opening statement, the state claimed that it was significant that officers saw Escalante use purported counter-surveilling techniques, which the state argued "will show is *consistent* with people who are involved in drug trafficking activities." The state continued—"he had a loaded handgun which you will hear about evidence of drug trafficking to protect those drugs [from] being taken by somebody else. That's what the evidence is going to show."

¶ 31 During the state's closing argument, the prosecutor stated, "I want to talk about drug trafficking ... drug trafficking is a subculture ... Culture, the beliefs, the customs, the way of life, a way of thinking, a way of behaving, a way of working that exists in a place or organization." The prosecutor asserted that the Phoenix area and I–17 is a "pipeline for narcotics distribution, and specifically meth from Mexico." The prosecutor recounted the testifying officers' extensive drug interdiction training and experience and restated that the neighborhood Escalante allegedly visited in Phoenix is "a drug traffic neighborhood." The prosecutor argued that a scale is carried by "[p]eople who deal drugs and buy drugs in bulk free sales."

¶ 32 Based on this record, given the extent to which the officers' drug courier profile testimony permeated the trial, we cannot conclude that as to count one—the charge of "transporting a dangerous drug for sale"— the state did not offer the officers' drug courier testimony as substantive evidence of Escalante's guilt. Such evidence should not have been permitted; its admission was thus error. *See Gonzalez*, 229 Ariz. at 553, ¶ 12, 278 P.3d at 331.

### 2. The state's other evidence

¶ 33 On appeal, the state highlights several pieces of evidence it argues would have resulted in a conviction even absent the inadmissible statements by the officers. It argues the following evidence was relevant to count 1:

(1) the testimony that another driver pulled over for speeding shortly after leaving Escalante's apartment had $940 (two $100 bills and the rest in $20 bills). As noted, no drugs were found on this driver or in his car;

(2) Escalante traveled almost two hours to Phoenix and stayed only 15 to 20 minutes before beginning his return to Yavapai County;

(3) After Escalante was stopped, a canine alerted to the odor of narcotics on the driver's side of Escalante's vehicle; the dog alerts to four different types of drugs without distinguishing among them;

(4) A scale bearing methamphetamine residue was found in Escalante's truck when it was searched for the second time;

(5) As noted above, approximately two hours after officers stopped Escalante's vehicle, they discovered the plastic bag of 47.8 grams of methamphetamine on the road where Escalante had been driving. However, Escalante's fingerprints were not found on the bag and the state offered no evidence or argument that Escalante could have been wearing gloves. Further, Escalante denied possessing the drugs; and

(6) Escalante had $350 on him at the time he was pulled over.

¶ 34 There is also evidence in the record that Escalante's cellphone contained messages saying "Hey bro give me a call. Need to place an order," and "If you got any let me know." The state also presented maps illustrating the area of Prairie Lane onto which Escalante turned after exiting Highway 260 and Cliff View Drive where he stopped.

### 3. We find no reversible error.[5]

¶ 35 Under *Henderson*, to establish fundamental error, Escalante must show "the error complained of goes to the foundation of his case, takes away a right that is essential to his defense, and is of such magnitude that he could not receive a fair trial." 210 Ariz. at 568, ¶ 24, 115 P.3d at 608.[6] We find no reversible error as to count 1.

---

5. Escalante's opening brief references *Lee* in support of the proposition that admission of improper drug courier profile evidence was not harmless error. *See Lee*, 191 Ariz. at 546, ¶ 19, 959 P.2d at 803. However, as established by *Henderson* seven years after the *Lee* decision, the standard of review in this case is fundamental, not harmless, error. *See Henderson*, 210 Ariz. at 567–68, ¶¶ 17–20, 24, 115 P.3d at 607–08.

6. In this decision, we discuss all three elements which *Henderson* indicates are required to show fundamental error. However, we note an internal inconsistency in *Henderson* as to whether a defendant must prove all three elements, or whether any one of the listed elements would suffice. While the quoted text is written in the conjunctive, in support of the rule, *Henderson* cites *State v. Hunter*, 142 Ariz. 88, 90, 688 P.2d 980, 982 (1984), which suggests that each element consti-

¶ 36 In light of our conclusion that the state impermissibly offered the drug courier profile evidence as substantive evidence, such evidence arguably went to the foundation of the case against Escalante on count 1. *See, e.g., State v. Stevens*, 228 Ariz. 411, 416–17, ¶¶ 15–16, 267 P.3d 1203, 1208–09 (App. 2012) (concluding, on fundamental error review, that evidence offered as substantive evidence of guilt went to the foundation of the case). However, viewing the trial evidence in its totality, we find that even absent the impermissible inferences, the jury had substantial evidence to convict Escalante on count 1.

¶ 37 On his return from Phoenix, Escalante exited Highway 260 onto Prairie Lane knowing officers were following him. He exited the highway far from the vicinity of his apartment in Cottonwood, under circumstances strongly suggesting that he did so to evade the officers and ultimately to dispose of the methamphetamine he had been carrying. This inference, in conjunction with the scale with methamphetamine residue found in Escalante's truck, the methamphetamine found on the road, and the messages on his cellphone, reasonably supports the conclusion that Escalante was carrying the scale to weigh the methamphetamine he had for sale.

¶ 38 Escalante has not established other elements of fundamental error. He has not shown he was deprived of a right essential to his defense by the state's use of the impermissible drug courier profile testimony. Instead, it appears his failure to object to the evidence may have been strategic—allowing the state to run amok with the drug courier profile evidence. *See infra* ¶¶42–44. Escalante has not shown that the error was of a magnitude such that it is unlikely that he received a fair trial.

¶ 39 Nor has Escalante affirmatively demonstrated that the drug courier profile evidence caused him prejudice. *Henderson*, 210 Ariz. at 568, ¶ 26, 115 P.3d at 608; *see also id.* at 567, ¶ 19, 115 P.3d 601, 607 (quoting *State v. Valdez*, 160 Ariz. 9, 13–14, 770 P.2d 313, 317–18 (1989) (explaining that under fundamental error review, we place the burden to

prove prejudice on the defendant, "to discourage a defendant from 'tak[ing] his chances on a favorable verdict, reserving the 'hole card' of a later appeal on [a] matter that was curable at trial, and then seek[ing] appellate reversal' ")).

¶ 40 "The showing [of prejudice] a defendant must make varies, depending upon the type of error that occurred and the facts of a particular case." *Id.* at 568, ¶ 26, 115 P.3d at 608. Here, since the nature of the error Escalante complains of was the state's dependence on the impermissible evidence, from the opening statements through closing arguments, Escalante had the burden to show that absent the inadmissible evidence, and applying the appropriate standard of proof, the jury could have reached a different result. *See, e.g., id.* at 569, ¶ 27, 115 P.3d at 609 (requiring the defendant to show that "a reasonable jury, applying the appropriate standard of proof, could have reached a different result than did the trial judge" where the nature of the error at issue deprived the defendant of "the opportunity to require that a jury find facts sufficient to expose him to an aggravated sentence").

¶ 41 Escalante argues that absent the inadmissible evidence, the prosecution presented "very little evidence of guilt." He contends the jurors' questions demonstrate the inadmissible evidence weighed substantially on the jurors' minds and therefore prejudiced him. Escalante specifically identifies the following questions asked by the jury:

Was [Escalante] directly asked if he was in Phoenix and what was his answer?

. . .

Can you verify the meth on the scale can be matched to the meth sample?

. . .

Was the second phone a cell and was it on [Escalante] when he was stopped or found in the vehicle?

These questions do not necessarily indicate that the jury was unduly influenced by the improper evidence. Therefore, we conclude

---

tutes a distinct error that, standing alone, may amount to fundamental error. *Hunter*, in turn, references *State v. Libberton*, 141 Ariz. 132, 138,

685 P.2d 1284, 1290 (1984), which lists only the first two elements in the disjunctive.

that Escalante *has not* shown resulting prejudice. Moreover, if Escalante's failure to object to the impermissible evidence was a defense strategy, under that circumstance, he *cannot* show prejudice and therefore could not meet his burden under fundamental error review.

¶ 42 Before trial, the state moved in limine to allow evidence of information it received from a confidential informant and a concerned citizen about Escalante's alleged drug trafficking. It also moved to allow evidence that authorities had been told and verified that Escalante had installed "surveillance equipment often associated with drug trafficking," that Escalante "when followed by narcotic and gang detectives engaged in driving consistent with actions of individuals selling drugs," that surveillance revealed "high volume and short term traffic coming and going" from Escalante's home consistent with drug trafficking, that Escalante drove on the day in question to "an area known for drugs [sic] sales and drug use" in Phoenix, and that authorities retrieved inculpatory text messages from Escalante's cell phone. In responding to the motion, Escalante only objected to admission of the text messages, but at the related evidentiary hearing his counsel acknowledged that the officers would be "allowed to testify as to their investigation ... [and in accordance with] their training and experience what they believe that information means."

¶ 43 While it may very well be that Escalante's counsel did not object to the other evidence because he did not know he could, the record most clearly suggests counsel did not object because he did not consider the officers' testimony to be "real evidence." Counsel's implicit conclusion that he did not consider the officers' testimony to be "real evidence" is reflected in the record of the motion in limine hearing. He thereafter used his conclusion about the testimony as a talking point that informed his defense strategy throughout the trial, arguing the evidence (or the "real evidence") was insufficient to support a finding of guilt.

¶ 44 In his brief opening statement, Escalante's trial counsel referred to the "parade" of investigating police officers the prosecutor intended to present during the trial, and asserted that the whole months-long investigation of Escalante came about because "law enforcement had convinced themselves that he was selling drugs." During his closing argument to the jury, counsel characterized the prosecution's case as "three days [spent] blowing a lot of smoke from a lot of law enforcement officers." He argued that the "parade" of officers showed that law enforcement had committed themselves so thoroughly to their belief that Escalante was selling drugs, notwithstanding there was nothing to show for so much investigative activity, that the reported discovery of drugs in the street and a scale in the truck could not be sustained as legitimate—suggesting that evidence was fabricated. Counsel stated: "when they pulled over Erick on the 21st they didn't find any drugs and that was a problem ... it's not looking good for them, so now you've got to start thinking about we need more evidence. And then the evidence appears after the fact." Counsel argued that the jury was given nothing more by the state than "a parade of police officers who were convinced that Erick Escalante is a drug dealer and no hard evidence that he really is." It thus appears the defense used the state's irrelevancies to establish the state's motives as ill-intentioned and its evidence as unworthy of credibility. Accordingly, the possibility that counsel may not have known he could have objected to the drug courier evidence does not foreclose the apparent probability that he did not object to the evidence at trial because he wanted to show that the state did not proffer sufficient "real evidence" to support a conviction.

¶ 45 A defendant cannot show prejudice, and thus cannot obtain reversal under fundamental error review, even though the state substantively used impermissible drug courier profile evidence throughout the trial, where the record suggests the defendant did not object to the impermissible evidence as part of his defense strategy, and there is otherwise substantial evidence of his guilt.[7]

---

7. While we conclude that Escalante cannot meet his burden under fundamental error review, we

note that this does not preclude a defendant

Accordingly, based on the record, we affirm Escalante's conviction on count one.

## B. Count 2

¶ 46 To obtain a conviction of "possession or use of drug paraphernalia," the state had to prove that Escalante used or "possessed with intent to use, drug paraphernalia." A.R.S. § 13–3415(A) (2010). Subsection (F)(2) defines drug paraphernalia as

> all equipment, products and materials of any kind which are used, intended for use or designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging ... or otherwise introducing into the human body a drug in violation of this chapter.

¶ 47 In addition to logically relevant factors, "[i]n determining whether an object is drug paraphernalia," a fact finder shall consider, among other things, "[t]he existence of any residue of drugs on the object." *Id.* at (E)(5).

¶ 48 The evidence that the scale found in the vehicle Escalante was driving was found to contain methamphetamine residue, coupled with the fact that intent is typically shown by circumstantial evidence, was sufficient to render the scale drug paraphernalia and to convict Escalante for possessing it.

## C. Count 3

¶ 49 To obtain a conviction for "tampering with physical evidence," the state had to prove that a person—here, Escalante, "with intent that [the evidence] be ... unavailable in an official proceeding ... which such person knows is about to be instituted, such person: 1. Destroys, mutilates, alters, conceals or removes physical evidence with the intent to impair its verity or availability." A.R.S. § 13–2809(A)(1) (2010).

¶ 50 The record indicates that Escalante knew he was being followed by the officers on the night of his arrest, but he continued driving. Thus, drawing the neces-

sary inference to sustain the jury's verdict, we find the evidence was sufficient to support a determination by the jury, beyond a reasonable doubt, that Escalante discarded the methamphetamine found on the road as he continued driving to avoid being arrested and subsequently prosecuted.

## D. Count 5

¶ 51 To obtain conviction of "misconduct involving weapons," the state had to prove Escalante knowingly used or possessed a deadly weapon during the commission of a felony offense, while "a prohibited possessor." A.R.S. § 13–3102(A)(4), (8) (2010).

¶ 52 The record demonstrates Escalante is a prohibited possessor. As previously noted, there was a .380 caliber handgun on the driver's side inside the vehicle Escalante was driving and the relevant offense in count 1 is a felony offense. This evidence was sufficient, separate from the impermissible drug courier inference, to support the jury's conviction on this count.

¶ 53 We thus hold Escalante has not shown that the erroneous admission and reliance on the officers' drug courier profile testimony constitute fundamental and prejudicial error as to the convictions he challenges.

## III. Confrontation Clause

¶ 54 Escalante argues that the officers' statements about the information received from the concerned citizens and informants violated his rights under the Confrontation Clause as set forth in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Again, because Escalante failed to assert this objection at trial, we review this claim for fundamental error. *Henderson,* 210 Ariz. at 567, ¶ 19, 115 P.3d at 607. As previously noted, Escalante necessarily must prove "both that fundamental error occurred and that the error caused him prejudice." *Id.* at 568, ¶ 22, 115 P.3d at 608.

¶ 55 The Sixth Amendment of the United States Constitution states, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the wit-

under these circumstances from claiming ineffec-

tive assistance of counsel in a Rule 32 petition.

nesses against him." U.S. Const. amend. VI. This Confrontation Clause bars the admission of "testimonial hearsay." *Crawford*, 541 U.S. at 53, 124 S.Ct. 1354. Hearsay is defined as a statement, other than one made by the declarant while testifying at the instant trial or hearing, offered in evidence to prove the truth of the matter asserted. Ariz. R. Evid. 801(c).

¶ 56 Here, the officers testified about tips and other information received from informants and concerned citizens. Even assuming this testimony was inadmissible, as to this issue on appeal, Escalante has again failed to satisfy his burden to establish prejudice under fundamental error review. *See supra* ¶¶11, 40.

## CONCLUSION

¶ 57 For the foregoing reasons, we affirm the verdicts on all counts.