IN THE

# SUPREME COURT OF THE STATE OF ARIZONA
_____

**STATE OF ARIZONA,**
*Appellee,*

*v.*

**ERICK ANTONIO ESCALANTE,**
*Appellant.*

_____

No. CR-17-0251-PR
Filed September 14, 2018
_____

Appeal from the Superior Court in Yavapai County
The Honorable Michael R. Bluff, Judge
No. CR201580042
**REVERSED IN PART AND REMANDED**

Opinion of the Court of Appeals, Division One
242 Ariz. 375 (App. 2017)
**VACATED IN PART**
_____

COUNSEL:

Mark Brnovich, Arizona Attorney General, Dominic E. Draye, Solicitor General, Joseph T. Maziarz, Chief Counsel, Criminal Appeals Section, Eric Knobloch (argued), Assistant Attorney General, Phoenix, Attorneys for State of Arizona

Kennedy Klagge, Yavapai County Public Defender, Michelle L. DeWaelsche (argued), Deputy Public Defender, Prescott, Attorneys for Erick Antonio Escalante

David J. Euchner (argued), Tucson, Attorney for Amici Curiae Arizona Attorneys for Criminal Justice and Pima County Public Defender's Office
_____

JUSTICE TIMMER authored the opinion of the Court, in which CHIEF JUSTICE BALES, VICE CHIEF JUSTICE BRUTINEL, and JUSTICES PELANDER, BOLICK, GOULD, and LOPEZ joined.

JUSTICE TIMMER, opinion of the Court:

¶1 When a defendant fails to object to trial error, he forfeits appellate relief absent a showing of fundamental error. Faced with conflicting decisions, we today clarify what that showing entails. A defendant must demonstrate that the error goes to the foundation of the defendant's case, takes away a right essential to the defense, or is of such magnitude that it denied the defendant a fair trial. To warrant reversal, the defendant must then show prejudice. But if the trial is found to have been unfair, prejudice is automatically established, and no further showing is required.

¶2 Here, the admission and pervasive use of drug-courier profile evidence during the defendant's trial on drug-related charges constituted fundamental error and prejudiced his ability to receive a fair trial. We therefore reverse and remand for a new trial.

## BACKGROUND

¶3 Detectives in multi-agency task forces suspected Erick Escalante of selling methamphetamine in the Verde Valley area. After receiving several tips and surveilling Escalante, detectives obtained a search warrant and placed a GPS tracking device on his truck. On the evening of January 21, 2015, detectives saw that Escalante's truck was in Phoenix and suspected he might be picking up methamphetamine to sell. Anticipating the truck's return to Escalante's home outside Cottonwood, a detective called the Yavapai County Sheriff's Office and asked that deputies attempt to conduct a civil traffic stop.

¶4 Two deputies in patrol cars identified the truck near Cottonwood and followed as it exited Highway 260 at Prairie Lane and eventually turned onto Cliff View Drive, a two-lane residential road. The truck veered as if to make a U-turn and stopped perpendicular to the roadway. The deputies blocked the road with their cars and activated their lights to make a civil traffic stop. As a deputy approached the truck, Escalante shifted into reverse and started to back up. The deputy told him to stop, but Escalante shifted into drive saying he intended to "pull to the side of the road." The deputy pulled his gun and repeated his instruction

to stop and turn off the truck. Escalante seemed agitated but eventually complied. Later, at a police station, Escalante told officers he had traveled from Camp Verde.

¶5    The deputies searched the truck and found a semi-automatic handgun, several knives, and a machete. They also discovered a digital scale, dryer sheets, coffee beans, a flip cellphone with limited data and no provider subscription (a "throw phone"), and $200 (another $150 was found in Escalante's wallet). A K-9 officer came to the scene, and his dog "alerted" on the truck, but no drugs were found.

¶6    Within a few hours after Escalante's arrest and removal of the truck, a deputy returned to the scene. He found a sandwich-size plastic baggie containing a white crystalized substance in the middle of Prairie Lane near Highway 260. The bag appeared to have been run over, and some of the contents had spilled onto the roadway. A criminologist later determined that the bag contained 47.8 grams of methamphetamine (about one-tenth of a pound) and that the digital scale found in Escante's truck contained methamphetamine residue.

¶7    The State charged Escalante with four drug-related offenses: count one: sale or transport of a dangerous drug (methamphetamine); count two: possession or use of drug paraphernalia (the digital scale); count three: tampering with physical evidence (throwing the bag of methamphetamine out the truck window); and count five: possessing a deadly weapon while committing a felony (transportation of a dangerous drug for sale). He was also charged with four counts of misconduct involving weapons for possessing the handgun, the machete, and two knives as a convicted felon (counts four, six, seven, and eight). The trial court severed the four drug-related counts from the remaining counts.

¶8    Before trial, the State moved in limine to introduce evidence that Escalante had engaged in behaviors "indicative of and consistent with drug trafficking," such as driving in a manner designed to avoid police scrutiny ("heat runs"), using surveillance cameras at home, and traveling to areas of "known drug activity." Escalante's counsel did not object. At an evidentiary hearing on this and other motions, he stated only that "I think they're going to be allowed to testify as to in their training and experience what they believe that information means." The trial court ruled that the evidence was admissible as either intrinsic to the charged crimes or as "other act" evidence. *See* Ariz. R. Evid. 404(b).

¶9  At the trial on the drug-related charges, multiple law enforcement officers testified, without objection, about their specialized drug interdiction training and described common drug-trafficking methods and drug-courier habits that were consistent with Escalante's behaviors. Officers also testified about what they were told by third parties concerning Escalante's suspected illegal drug activities. The jury found Escalante guilty on all counts. He waived his right to a jury trial on the remaining weapons charges, and the trial court found him guilty on those counts. The court sentenced Escalante to multiple, concurrent prison terms, the longest of which is fourteen years.

¶10  Escalante appealed the drug-related convictions and sentences, and the court of appeals affirmed. *See State v. Escalante*, 242 Ariz. 375 (App. 2017). In doing so, the court reviewed for fundamental error whether the trial court incorrectly admitted drug-courier profile evidence and hearsay statements. *See id.* at 379 ¶11, 386 ¶ 54.

¶11  We granted review to clarify what a defendant must show to establish fundamental, prejudicial error, a recurring issue of statewide importance. We have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution and A.R.S. § 12-120.24.

**DISCUSSION**

**I. Fundamental error review**

¶12  Escalante argues that the trial court committed reversible error by permitting the State to introduce drug-courier profile and hearsay evidence as substantive evidence of guilt. Because Escalante did not object to this evidence, we will not reverse unless the court committed error that was both fundamental and prejudicial. *See State v. Henderson*, 210 Ariz. 561, 567 ¶ 20 (2005). Some confusion about what fundamental error review entails — much of it our own making — has arisen since this Court decided *Henderson*. Thus, we clarify that standard before applying it here.

¶13  In *Henderson*, this Court noted that prior appellate decisions had inconsistently described what is necessary to establish fundamental error. *Id.* at 568 ¶ 21. It set forth a single standard and disapproved inconsistent decisions. *Id.* The Court described fundamental error review as follows:

A defendant who fails to object at trial forfeits the right to obtain appellate relief except in those rare cases that involve "[prong 1] error going to the foundation of the case, [prong 2] error that takes from the defendant a right essential to his defense, *and* [prong 3] error of such magnitude that the defendant could not possibly have received a fair trial." . . . In addition, we place the burden of persuasion in fundamental error review on the defendant. . . .

To prevail under this standard of review, a defendant must establish both that fundamental error exists and that the error in his case caused him prejudice.

*Id.* at 567 ¶¶ 19–20 (emphasis added) (quoting *State v. Hunter*, 142 Ariz. 88, 90 (1984) (citing *State v. Gendron*, 168 Ariz. 153, 155 (1991) (holding that fundamental error is that which is "clear, egregious, and curable only via a new trial"))).

**¶14** Unfortunately, the word "and" in *Henderson*'s three-prong test for fundamental error muddies its application. The Court may have used the term to mean that all three prongs must be shown (a conjunctive standard). Or the Court may have used the term in listing the "rare" types of error that are fundamental error, meaning only one prong must be shown (a disjunctive standard), as *Hunter* implied. 142 Ariz. at 90. The *Henderson* Court itself applied a disjunctive standard, finding fundamental error when only one prong was shown. *See* 210 Ariz. at 568 ¶ 25.

**¶15** Since *Henderson*, this Court has exacerbated the confusion by variously treating the fundamental error standard as both conjunctive and disjunctive. *Compare State v. Escalante-Orozco*, 241 Ariz. 254, 272 ¶ 40 (2017) (conjunctive); *State v. Dalton*, 241 Ariz. 182, 186 ¶ 12 (2016) (same); *State v. Valverde*, 220 Ariz. 582, 585 ¶ 12 (2009) (same), *with State v. Naranjo*, 234 Ariz. 233, 246 ¶ 58 (2014) (disjunctive); *State v. Forde*, 233 Ariz. 543, 554 ¶ 16 (2014) (same); *State v. Hargrave*, 225 Ariz. 1, 8 ¶ 13 (2010) (same); *State v. Bearup*, 221 Ariz. 163, 168 ¶ 21 (2009) (same). Here, the court of appeals applied a conjunctive standard. *See Escalante*, 242 Ariz. at 383 ¶ 35.

**¶16** We now clarify that the appropriate standard for fundamental error under *Henderson* is disjunctive. Simply put, requiring a defendant to establish all three prongs is overkill. For example, no purpose is served by requiring a defendant to establish the first two prongs if the third prong is established. An "error of such a magnitude that a defendant

could not possibly have received a fair trial" is always prejudicial and requires a new trial. *See Henderson*, 210 Ariz. at 567 ¶ 20 (equating prejudice with an unfair trial) (citing *Hunter*, 142 Ariz. at 90 (holding that defendant must prove fundamental error exists, *and* is of such magnitude that he could not have received a fair trial)); *see also State v. Bible*, 175 Ariz. 549, 567 (1993) ("A fair trial is a fundamental liberty secured by the United States and Arizona Constitutions." (citing Ariz. Const. art. 2, §§ 4, 24)). The only way to give meaning to the first two prongs is to apply the *Henderson* test disjunctively.

¶17 Courts and parties have understandably grappled with the meaning of each *Henderson* prong and how they differ from each other. Precise definitions are elusive, as the prongs often overlap, and their application depends on fact-intensive inquiries. *See Henderson*, 210 Ariz. at 568 ¶ 26. A bright-line standard is inadvisable as it risks excluding a case that warrants relief. Nevertheless, we provide guidance that should cover most circumstances.

¶18 Prong one: An error generally goes to the "foundation of a case" if it relieves the prosecution of its burden to prove a crime's elements, directly impacts a key factual dispute, or deprives the defendant of constitutionally guaranteed procedures. *See, e.g.*, *Henderson*, 210 Ariz. at 568 ¶ 25 ("Because the sentencing procedure followed denied Henderson the right to have certain facts decided by a jury beyond a reasonable doubt, we conclude that the procedure utilized went to the foundation of Henderson's case."); *State v. McGann*, 132 Ariz. 296, 299 (1982) (finding that erroneous admission of fifty-seven allegedly forged receipts went to foundation of state's case that defendant's prior forgeries evidenced his guilt there); *State v. Juarez-Orci*, 236 Ariz. 520, 525 ¶ 17 (App. 2015) ("[T]he instruction at issue here potentially 'improperly relieved the State of its burden of proving an element of the offense,' an error which goes to the foundation of the case, and therefore is fundamental." (citations omitted)); *State v. Stevens*, 228 Ariz. 411, 417 ¶ 16 (App. 2012) (concluding that the state's use of defendant's invocation of her Fourth Amendment rights as evidence of guilt went to the foundation of the case—whether the defendant was merely present or was the person who possessed drugs and drug paraphernalia).

¶19 Prong two: An error takes away an "essential right" if it deprives the defendant of a constitutional or statutory right necessary to establish a viable defense or rebut the prosecution's case. *See, e.g.*, *State v. Valenzuela*, 194 Ariz. 404, 407–08 ¶ 16 (1999) ("By failing to give the [lesser

included offense instruction], the trial court denied appellant 'a right essential to his defense' and affected the 'very foundation of [his] theory of defense.'" (alteration in original)); *State v. Ramos*, 235 Ariz. 230, 235 ¶ 15 (App. 2014) ("In light of [the prosecutor commenting on defendant's failure to testify], fundamental error occurred because Ramos was deprived of a right essential to his defense."); *State v. Trujillo*, 227 Ariz. 314, 318 ¶ 15 (App. 2011) (concluding that sentencing judge's consideration of defendant's lack of remorse and failure to admit guilt to aggravate sentences deprived him of a right essential to his defense).

¶20        Prong three: An error so egregious that a defendant could not possibly have received a fair trial encompasses either or both prongs one and two. But to satisfy prong three, the error must so profoundly distort the trial that injustice is obvious without the need to further consider prejudice. *See, e.g.*, *Sheppard v. Maxwell*, 384 U.S. 333, 355–57 (1966) (reversing murder conviction because "bedlam reigned" when about twenty reporters sat "inside the bar" "staring at [the defendant] and taking notes," "hounding most of the participants in the trial," and printing sensationalized stories); *Rideau v. Louisiana*, 373 U.S. 723, 724, 726–27 (1963) (concluding that defendant, whose twenty-minute taped confession to robbery, kidnapping, and murder was televised three times in a parish of around 150,000 people, could not possibly have received a fair trial as, even without considering voir dire, "subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality").

¶21        To summarize, the first step in fundamental error review is determining whether trial error exists. *Henderson*, 210 Ariz. at 568 ¶ 23 ("To obtain relief under the fundamental error standard of review, [a defendant] must first prove error."). If it does, an appellate court must decide whether the error is fundamental. In doing so, the court should consider the totality of the circumstances. *See Gendron*, 168 Ariz. at 155 (requiring an appellate court to analyze the entire record to determine whether "reasons clearly demonstrat[e] that the case falls within our definition of fundamental error"). A defendant establishes fundamental error by showing that (1) the error went to the foundation of the case, (2) the error took from the defendant a right essential to his defense, *or* (3) the error was so egregious that he could not possibly have received a fair trial. If the defendant establishes fundamental error under prongs one or two, he must make a separate showing of prejudice, which also "involves a fact-intensive inquiry." *Henderson*, 210 Ariz. at 568 ¶ 26. If the defendant establishes the third prong, he has shown both fundamental error and prejudice, and a new

trial must be granted. The defendant bears the burden of persuasion at each step. *Id.* at 567 ¶ 19.

## II. Admission of drug-courier profile evidence

### A. Error

**¶22** Drug-courier profile evidence suggests that a defendant possesses one or more behavioral characteristics typically displayed by persons trafficking in illegal drugs. *See State v. Haskie*, 242 Ariz. 582, 585 ¶ 14 (2017); *State v. Lee*, 191 Ariz. 542, 544 ¶ 10 (1998). Such evidence has legitimate uses, for instance when the justification for a police stop or arrest is contested at a suppression or probable cause hearing. *State v. Ketchner*, 236 Ariz. 262, 264 ¶ 15 (2014). It can also be used to assist a jury in understanding the modus operandi of a drug-trafficking organization. *See Lee*, 191 Ariz. at 547 ¶ 26 (Jones, J., dissenting). But profile evidence cannot be used as substantive proof of guilt because of the "risk that a defendant will be convicted not for what he did but for what others are doing." *Id.* at 545 ¶ 12 (internal quotation marks omitted) (quoting *State v. Cifuentes*, 171 Ariz. 257, 257 (App. 1991)); *see also Haskie*, 242 Ariz. at 586 ¶ 15 (to same effect).

**¶23** The prosecutor here introduced drug-courier profile evidence. He elicited testimony from officers who, after relating their training and experience in drug interdiction, described typical behaviors of drug-traffickers, thereby suggesting that because Escalante also engaged in such behaviors, he too was a drug-trafficker. *See Lee*, 191 Ariz. at 544 ¶ 10. For example, jurors heard testimony that drug-traffickers often use surveillance cameras outside their homes; make "heat runs"; carry dryer sheets and coffee beans to mask the smell of drugs from police dogs; create secret compartments in vehicle dashboards to hide drugs; generally travel at night to conceal their movements and provide cover for surreptitiously throwing drugs out a vehicle window to avoid law enforcement detection; carry firearms; use "throw phones" for easy disposal; travel along drug "pipelines," like I-17; and measure drugs with small electronic scales. Officers also testified that Escalante traveled to an "active drug area" in Phoenix, which they described as a "major hub" for methamphetamine and the source for most illegal drugs sold in the Verde Valley.

**¶24** We agree with Escalante and the court of appeals that admission of this testimony constituted error because the evidence was used as substantive proof of guilt. *See Escalante*, 242 Ariz. at 383 ¶ 32; *see also Ketchner*, 236 Ariz. at 264 ¶ 15. The testimony was only relevant to

demonstrate that Escalante's behaviors were consistent with drug trafficking. Indeed, the prosecutor told the jury in opening statement that Escalante's observed "counter-surveillance techniques" were "consistent with people who are involved in drug trafficking activities." And in closing argument, the prosecutor said "people who deal drugs have certain ways of behaving" and reminded jurors that the testifying officers possessed "detailed knowledge" about drug-traffickers and had related "indicators of drug activity."

¶25          Expert testimony about general behaviors is permitted if helpful to a jury's understanding of the evidence. *See State v. Salazar-Mercado*, 234 Ariz. 590, 594 ¶ 15 (2014). Here, for example, a qualified officer could have explained that dryer sheets and coffee beans, like the ones found in Escalante's truck, can be used to mask the smell of illegal drugs from police dogs. But officers could not permissibly testify that possession of dryer sheets and coffee beans, together with other behaviors, was "consistent with drug trafficking" because doing so served only to invite the jury to find that Escalante, too, was a drug-trafficker.

## B.  Fundamental error

¶26          The admission of drug-courier profile evidence here went to the foundation of the case and therefore constitutes fundamental error. The pivotal factual issue in the case was whether Escalante had possessed the methamphetamine found on Prairie Lane with an intent to sell it (count one). (Proof of counts three and five also depended on resolution of that issue.) The evidence tying Escalante to the baggie of methamphetamine was circumstantial and not overwhelming. Methamphetamine residue was present on the scale found inside Escalante's truck. Two incoming text messages on the "throw phone" suggested Escalante was selling something ("Hey, bro. Give me a call. Need to place an order." and "If you've got any, let me know."). In the months before the arrest, multiple people made short-term visits to Escalante's apartment. Escalante lied about traveling from Phoenix when he was stopped. But the baggie was found in the middle of the road hours after Escalante's arrest, casting doubt on whether he had discarded the drug. Notably, jurors posed several questions about the drug's discovery and origins: "Do you think it is unusual that the white substance in the road was not spotted by all the law enforcement who went up and down the road that night of the arrest? Explain conditions that might have made this possible that it wasn't seen"; "Was the baggie from the road tested for fingerprints? Would it have been possible to find fingerprints on the bag?" Fingerprint analysis was not done, and DNA

testing "revealed nothing" to indicate that Escalante had possessed the baggie.

¶27       Evidence that Escalante fit the profile of a drug trafficker greatly increased the likelihood the jury would find that he possessed the drug with the intent to sell it before discarding it to prevent detection. *See Stevens*, 228 Ariz. at 417 ¶ 16. The evidence was not a brief hiccup but permeated the trial, being elicited from eight officers over three days and referred to by the prosecutor in both the opening statement and closing argument. *Cf. State v. Hulsey*, 243 Ariz. 367, 433 ¶ 114 (2018) (finding that the "brevity and inconsequential nature" of the erroneous reference to defendant's identity did not constitute fundamental error); *State v. Valdez*, 160 Ariz. 9, 14 (1989) (concluding no fundamental error when prosecutor's improper closing argument reference to defendant seeking a plea agreement was "an isolated evidentiary matter"). In short, the linchpin of the State's case against Escalante "was to suggest that because [Escalante's] behavior was consistent with that of [a] known drug courier[], [he] likewise must have been [a] courier[]." *Lee*, 191 Ariz. at 546 ¶ 18. Admission of this evidence went to the foundation of the case and constituted fundamental error.

¶28       The court of appeals reached the opposite conclusion because "the jury had substantial evidence to convict Escalante on count 1." *See Escalante*, 242 Ariz. at 384 ¶ 36. But that is not a proper consideration in deciding whether the error went to the foundation of the case. Instead, the impact of the error on the jury's verdict is appropriately considered when addressing prejudice. The court also found that because Escalante failed to show all three *Henderson* prongs, he did not establish fundamental error. *See id.* at 383–84 ¶¶ 35–38. As clarified today, a defendant need only show one prong to establish fundamental error, and Escalante made that showing.

## C. Prejudice

¶29       Establishing prejudice from fundamental error varies depending on the nature of the error and the unique case facts. *See Dalton*, 241 Ariz. at 186 ¶ 13; *Henderson*, 210 Ariz. at 568 ¶ 26. The error here deprived Escalante of the opportunity for the jury to render a verdict free of the taint of drug-courier profile evidence. Escalante therefore must show that without this evidence and attendant argument, "a reasonable jury . . . *could have* reached a different [verdict]." *See Henderson*, 210 Ariz. at 569 ¶ 27 (emphasis added); *see also State v. Martin*, 225 Ariz. 162, 166 ¶¶ 14–15 (App. 2010) (applying this standard in finding that even if it was

fundamental error to admit videotape in evidence, it did not prejudice the defendant).

**¶30**     The State urges us to require a defendant to show that a reasonable jury *would have* reached a different result but offers no compelling reason or authority for doing so. *Henderson*'s "could have" standard is well-accepted and complements the state's burden in harmless-error review to prove "beyond a reasonable doubt that the error did not contribute to or affect the verdict or sentence." *See Escalante-Orozco*, 241 Ariz. at 286 ¶ 126 (citation and internal quotation marks omitted).

**¶31**     This is not to say that the "could have" standard is easily satisfied. In keeping with *Henderson*'s pronouncement that appellate relief for fundamental error occurs in "rare cases" and such error is "curable only via a new trial," the "could have" inquiry necessarily excludes imaginative guesswork. The standard is an objective one, and requires a showing that without the error, a reasonable jury could have plausibly and intelligently returned a different verdict. A "reasonable jury" is "composed of persons of average intelligence and judgment" who "use[] common sense in considering the evidence presented in connection with the instructions given by the court." *Citizens Utils. Co. v. Firemen's Ins.*, 73 Ariz. 299, 302 (1952). In applying the "could have" standard, an appellate court should examine the entire record, including the parties' theories and arguments as well as the trial evidence. *See Gendron*, 168 Ariz. at 155; *State v. Gulli*, 242 Ariz. 18, 21 ¶ 13 (App. 2017).

**¶32**     We decline to adopt Amicus's suggestion that we apply a subjective standard to determine whether the jury that rendered the verdict could have reached a different result without the error. An appellate court cannot know what did or did not guide a particular jury's determination. Because that jury and a hypothetical "reasonable jury" share the same presumptive traits, however, any questions posed by jurors during trial or deliberation may be pertinent in applying the standard objectively.

**¶33**     The court of appeals concluded, without citation to authority, that "[a] defendant cannot show prejudice, and thus cannot obtain reversal under fundamental error review . . . where the record suggests the defendant did not object to the impermissible evidence as part of his defense strategy, and there is otherwise substantial evidence of his guilt." *See Escalante*, 242 Ariz. at 385 ¶ 45. Because an "apparent probability" existed that defense counsel here deliberately failed to object to the profile evidence "because he wanted to show that the state did not proffer

sufficient 'real evidence' to support a conviction," the court found that Escalante failed to show prejudice. *Id.* ¶¶ 42–45. It suggested that any remedy must be secured by asserting an ineffective assistance of counsel claim in post-conviction relief proceedings. *Id.* ¶ 45 n.7.

¶34 We disagree with the court of appeals for two reasons. First, whether "substantial evidence of guilt" exists is not the standard for deciding prejudice. As just explained, the proper inquiry is whether, without the error, a reasonable jury could have reached a different result, even if substantial evidence of guilt exists. Of course, the amount of error-free evidence supporting a guilty verdict is pertinent to that inquiry. *See, e.g., State v. Ramos*, 235 Ariz. 230, 237 ¶ 20 (App. 2014) ("Given the strength of the State's evidence . . . we hold that even without the prosecutor's impermissible statements . . . no reasonable jury could have acquitted Ramos . . . .").

¶35 Second, putting aside the practical problems associated with divining whether defense counsel's silence was strategic or neglectful, tactical reasons for remaining silent in the face of trial error do not preclude a finding of prejudice. The consequence for strategically failing to object to trial error is bearing the formidable burden of showing that the error was fundamental and warrants the "rare case" remedy of reversal and a new trial. *See Henderson*, 210 Ariz. at 567 ¶ 19 (imposing the burden of persuasion on the defendant "to discourage a defendant from taking his chances on a favorable verdict, reserving the 'hole card' of a later appeal on a matter that was curable at trial, and then seeking appellate reversal") (internal interlineations and citation omitted). And eliminating the availability of appellate relief would be contrary to the purpose of fundamental error review: granting relief when issues are "so important that overriding considerations concerning the integrity of the system will excuse a party's failure to raise the issue in the trial court." *See Gendron*, 168 Ariz. at 155.

¶36 Prior decisions from this Court cited by the State do not persuade us to reach a different decision. None of these cases suggests that a defendant necessarily loses the ability to obtain appellate relief for fundamental, prejudicial error if defense counsel strategically failed to object to trial error. *See State v. Miller*, 234 Ariz. 31 *passim* (2013) (finding no fundamental error based on multiple factors, including defense counsel's professed "strategic choice" not to object to inadmissible testimony); *Gendron*, 168 Ariz. at 155 (emphasizing the limited circumstances in which fundamental error occurs and noting that "[a] claim of fundamental error

is not a springboard to reversal where present counsel is simply second-guessing trial counsel." (quoting *State v. Smith*, 114 Ariz. 415, 420 (1977))); *State v. Perez*, 141 Ariz. 459, 464 n.6 (1984) (finding no error from the trial court's refusal to give a requested *Willits* instruction and noting that defense counsel could not claim prejudice anyway because he could have argued the substance of the instruction but "made a tactical decision" to forego it).

¶37        The State also cites cases from other jurisdictions that conclude or suggest that when a failure to object could have been strategic, it is more appropriate to consider the issue in post-conviction relief proceedings than in fundamental error review. *See Johnson v. State*, 765 A.2d 926, 929 (Del. 2000); *State v. Perry*, 245 P.3d 961, 981 (Idaho 2010); *Ryan v. State*, 9 N.E.3d 663, 668 & n.4 (Ind. 2014). (*State v. Foxen*, 29 P.3d 1071, 1075 (N.M. 2001), also cited by the State, is inapposite as it equated strategic decisions to submit erroneous jury instructions with invited error.)  We decline to follow these cases.  If fundamental, prejudicial error necessitates a new trial, no reason exists to await post-conviction relief proceedings to grant that remedy.  And doing so would only delay justice and waste judicial resources.

¶38        Importantly, if defense counsel invited trial error, strategically or carelessly, the defendant cannot obtain appellate relief even if the error was fundamental and prejudicial. *See State v. Logan*, 200 Ariz. 564, 566 ¶ 15 (2001).  "Invited error" occurs when the defendant is the source of that error. *See id.* ¶ 11 (i.e., "the party urging the error").  Failing to object to error, as occurred here, even if done strategically, forfeits appellate review—absent fundamental, prejudicial error—but does not foreclose appellate review by inviting error. *See State v. Rushing*, 243 Ariz. 212, 217 ¶ 14 (2017).

¶39        The court of appeals also concluded that Escalante failed to show that without the profile evidence a reasonable jury could have reached a different verdict. *See Escalante*, 242 Ariz. at 384–85 ¶¶ 40–41.  In doing so, it rejected Escalante's argument that juror questions demonstrated the prejudicial impact of the profile evidence but did not address his contention that without that evidence, "very little evidence of guilt" existed. *Id.* ¶ 41.

¶40        We disagree with the court of appeals and instead conclude that Escalante has demonstrated that the erroneous admission of drug-courier profile evidence prejudiced his trial on counts one, three, and five.

Guilty verdicts on those counts depended on the jury finding that Escalante possessed the methamphetamine found in the road with the intent to sell it. *See* A.R.S. §§ 13-2809, -3102, -3407. As previously explained, the admissible evidence supporting the prosecution's case on these counts was circumstantial and prompted several questions from the jury about the baggie's ownership. *See supra* ¶ 26. That Escalante's behaviors fit the drug-courier profile laid out by law enforcement officers trained in illegal drug interdiction greatly enhanced the likelihood that jurors would conclude that Escalante had possessed the methamphetamine with the intention of selling it. Also, the profile evidence permeated the trial from start to finish. *See supra* ¶ 23; *see also Escalante*, 242 Ariz. at 384 ¶ 38 (describing the prosecution as "run[ning] amok with the drug courier profile evidence"). Without the drug-courier profile evidence, a reasonable jury considering the remaining evidence could plausibly and intelligently find him not guilty on counts one, three and five.

¶41 The State points out that defense counsel used the profile evidence to support his theory that law enforcement officers targeted Escalante with no "real evidence." Specifically, defense counsel argued in closing that the State "spent three days blowing a lot of smoke from a lot of law enforcement officers" and "a parade of police officers" was convinced Escalante was a drug dealer with "no hard evidence that he really is." It is appropriate to consider how inadmissible evidence impacted a defense theory when considering prejudice. *Cf. Escalante-Orozco*, 241 Ariz. at 278–79 ¶ 83 (concluding that even if evidence was inadmissible, defendant's use of the testimony to fit his defense theory precluded a finding of prejudice). But here, defense counsel's lemons-into-lemonade argument did not dissipate the prejudice caused by introducing profile evidence. Indeed, without that evidence, Escalante had an even stronger argument that the evidence against him was insufficient to support a guilty verdict.

¶42 Escalante did not prove that the admission of profile evidence prejudiced his defense or rendered the trial unfair on count two, possession of drug paraphernalia. A person commits that crime if he knowingly possessed drug paraphernalia with the intent to use it. *See* A.R.S. § 13-3415(A). "Drug paraphernalia" includes a digital scale if used to weigh illegal drugs. *Id.* § 13-3415(F)(2)(e). The evidence here was that a scale with methamphetamine residue was found in Escalante's truck. Even without the profile evidence a reasonable jury could not have reached a different verdict on this count.

**CONCLUSION**

**¶43**         Escalante's trial was infected with fundamental, prejudicial error that deprived him of a fair trial on counts one, three, and five. We therefore reverse his convictions and sentences on those counts and remand for a new trial. Because the error did not prejudice him on the remaining counts, we affirm Escalante's convictions and sentences on those counts. We vacate paragraphs 11, 25, 33-53 and 57 of the court of appeals' opinion. In light of our decision, we do not address Escalante's hearsay challenges, none of which concern count two.